No. 31,811

NAPOLEON MILTIMORE, *Appellee* and *Cross-Appellant,* v. THE CITY OF AUGUSTA, *Appellant.*

(38 P. 2d 675)

Opinion filed December 8, 1934.

*R. A. Cox,* of Augusta, *Stanley Taylor* and *K. M. Geddes,* both of El Dorado, for the appellant.

*E. W. Grant,* of El Dorado, *Robert C. Foulston* and *Lester L. Morris,* both of Wichita, for the appellee and cross-appellant.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal and a cross-appeal from a judgment increasing a condemnation award for the taking of certain lands to make a reservoir for a water supply for the city of Augusta.

Briefly the facts were these: The plaintiff owned a 160-acre farm about two miles north of Augusta, consisting partly of good agricultural bottom land and partly of upland suitable mostly for pasture and hay meadow. The farm buildings were somewhat poor and run down, probably because the owner had been in a sanatorium for some years and the premises had been occupied by successive tenants. A stream, Elm creek, fed by springs, flowed through the farm.

In 1930 the city of Augusta decided to make provision for a water supply. The inhabitants voted a bond issue of $130,000 for that purpose. Some 94.3 acres of plaintiff's land were condemned as a part of the site for the reservoir; and a condemnation award of $4,234.50 for plaintiff's land taken, and $660 as damages for the remainder of his farm not taken, was deposited with the city treasurer to satisfy the city's liability therefor.

Plaintiff declined to accept this award, and appealed to the district court. On the issues joined the jury returned a verdict in favor of plaintiff, assessing his damages at $10,087. The special findings read:

"1. What was the most valuable use for which the 160-acre tract of Napoleon Miltimore was adapted, on October 20, 1930? A. For impounding water.

"2. What do you find to be the fair and reasonable market value, for the most valuable use to which it was adapted, of the 94.3 acres which was taken

by the city of Augusta and included in the reservoir site, as of October 20, 1930? A. $9,430.

"3. What was the fair and reasonable market value of the 65.7 acres not taken as a part of the 160-acre tract on October 20, 1930, immediately before any part of said 160-acre tract had been appropriated for water-impounding purposes? A. $50 per acre.

"4. What was the fair and reasonable market value of the 65.7 acres of the Miltimore land remaining on October 20, 1930, and immediately after 94.3 acres had been appropriated by the city of Augusta? A. $40 per acre.

"5. How much do you allow Napoleon Miltimore as compensation for the 94.3 acres of land taken? A. $9,430.

"6. How much do you allow to Napoleon Miltimore as compensation, if anything, for depreciation of the 65.7 acres remaining? A. $657."

Judgment was entered accordingly, and the city appeals. In computing the interest due on the principal amount the court excluded therefrom any allowance of interest on the $4,894.50 which the city had deposited with the city treasurer payable to plaintiff's demand. From the latter ruling the plaintiff presents a cross-appeal.

Considering the questions raised by the appellant city, it is first contended that plaintiff's appeal was never properly perfected, and in consequence the district court had no jurisdiction. The pertinent statute provides that any owner of lands aggrieved by the paucity of the condemnation award may appeal—

"By filing with the clerk of said court, within thirty days after the filing of the decision or award of said commissioners, written notice of appeal, and giving bond for the costs thereof, to be approved by said clerk." (R. S. 26-205.)

In what respect plaintiff failed to conform to this statute in taking his appeal is not clear. Counsel for the city examine at some length certain statutes which formerly governed the exercise of eminent domain and appeals therefrom, and cite some decisions based thereon, but in the revision of 1923 the present statute (R. S. 26-101 et seq.) was enacted to supersede and unify a number of miscellaneous statutes dealing with this subject. (See Report of Commission to Revise The General Statutes, December, 1922, pp. 97-99, 277-278.) That there is yet much to be done to clarify and codify the law of eminent domain is apparent from the exhaustive treatment the subject has received in official issues of the *Judicial Council Bulletin* for October, 1932, December, 1932, and July, 1933. Be that as it may, the statute under which the appellant proceeded to condemn and appropriate plaintiff's property was article 2 of

chapter 26 of the Revised Statutes of 1923; and the procedural steps which plaintiff took to appeal from the condemnation award were taken in literal conformity with section 5 of that act. Counsel for appellant profess to be uncertain what court is meant where the statute, quoted in part above, says that the appeal must be filed with the clerk of *said court*. A perusal of earlier sections of the same statute makes it clear, we think, that it is the clerk of the district court of the county where the condemned land was situated— the same district court whose presiding judge appointed the condemnation commissioners at the instance of the appellant city. If this were a more difficult question than it is, we would not hesitate to refer to the civil code (R. S. 60-3301), and to the broad supervisory powers over all official boards and tribunals vested in the district court (R. S. 20-301), to determine, by deduction, that the "court" mentioned in the statute governing appeals from condemnation awards was the district court, and that an appeal filed with the clerk of *said* court was filed with the *only* functionary who could make it effective. And since the statute does not prescribe the precise *mode* of service of notice of appeal it would seem that any mode of service which would fairly notify the city would answer the purpose, and personal service of such a notice upon the mayor of the city was sufficient. To the point that plaintiff did not file a certified transcript of the condemnation proceedings in the district court a sufficient answer is that this desideratum is not one of the statutory requisites to perfect the appeal. By analogy—in ordinary litigation—a simple paper with a caption of a case and reciting that the litigant defeated in the district court intends to and does appeal to the supreme court, served on his prevailing adversary, and timely filed in the district court, will *perfect* an appeal to the supreme court. (R. S. 60-3306.) In such cases the transcript of the proceedings can come along more leisurely. And so here. The fact that a transcript of the condemnation proceedings did not accompany the notice of appeal did not vitiate it.

Error is next urged on the admission of testimony touching the value of plaintiff's land. Witnesses testified that its highest value inhered in its special fitness for use as a part of a reservoir site. It was conceded that it would not have been feasible to make a reservoir site of the 94.3 acres of plaintiff's land to serve the city's need without using other lands adjacent thereto; and appellant contends that because of this fact it was improper and erroneous

to determine the value of the condemned land on evidence of its adaptability for impounding water. In support of this contention the city cites the case of *McGovern v. New York,* 229 U. S. 363, 57 L. Ed. 1228, where the landowner's complaint was that in appraising the value of his land taken as part of a site for the Ashokan reservoir for the city of New York, the condemnation commissioners excluded from their consideration of values the evidence of the adaptability and availability of the property for reservoir purposes and evidence of its value as a reservoir site. When their case was before the appellate division of the New York supreme court, (*Matter of Simmons*) 130 App. Div. 350, (*In re Simmons*) 114 N. Y. Supp. 571, it was said:

"It is probably true that the commissioners might properly have received evidence tending to show that the Ashokan reservoir site is the cheapest, best, and most available site for water-supply purposes and for furnishing water to the city of New York, but it was not error to exclude the testimony offered as those facts were stated in the petition, . . . The record shows that the commissioners understood that these facts were established, and that they went no further than to hold that the facts could not be considered in forming an opinion of the market value of the property, in the absence of any evidence showing that they had enhanced or affected its value, before it was appropriated by the city. . . . There is no shadow of evidence of any prior demand for the property as a reservoir site or of any customer who would give more for it for that purpose, or of any circumstance by which the value of the parcel in question, as a part of the natural reservoir site, could be estimated or determined. In the absence of such evidence, it is plain that the appellant has received the benefit of everything which enhanced the value of his property, except the increase caused by the taking of it by the city." (p. 574.)

When the case came before the United States supreme court for review it was said:

"Mr. Justice Holmes . . . The enhanced value of the land as part of the Ashokan reservoir depends on the whole land necessary being devoted to that use. There are said to have been hundreds of titles to different parcels of that land. If the parcels were not brought together by a taking under eminent domain, the chance of their being united by agreement or purchase in such a way as to be available well might be regarded as too remote and speculative to have any legitimate effect upon the valuation. . . . The plaintiff in error was entitled to be paid only for what was taken from him as the titles stood, and could not add to the value by the hypothetical possibility of a change unless that possibility was considerable enough to be a practical consideration and actually to influence prices." (57 L. Ed. 1228, 1232.)

This New York case is distinguishable from the one at bar in two respects at least. In the New York case the condemned land was

valueless for a reservoir site except in connection with hundreds of different parcels of land; and there was no evidence of its enhanced value as a reservoir site other than that created by the city's necessity. In the case at bar the plaintiff's land supplied nearly half the site, and not more than two or three adjacent parcels were included in the reservoir site; and there was evidence showing that different people had repeatedly tried to buy the farm or part of it for reservoir purposes. Furthermore, water conservation and storage of waters for live stock and for domestic purposes are matters which in recent years have increasingly engaged public and private attention in this state. Two or three other water-storage projects have been developed in Butler county at no great distance from plaintiff's land in recent years. A witness for plaintiff testified:

"I am familiar with the Miltimore land. I am familiar with the general condition of the land, and the availability of sites for water-impounding purposes, located in the vicinity of Augusta, prior to October 20, 1930. I am familiar with the prices which were paid for similar lands in that vicinity.

"I am familiar with lands of similar character which had been theretofore utilized for water-impounding purposes, and with the watersheds existing in the vicinity of Augusta, which were unpolluted in 1930.

"After the Santa Fe lake was constructed, I know of no other supply in the vicinity of Augusta, in 1930, except Elm creek."

Another witness testified:

"The dam work I have been interested in is principally in connection with country estates, for pleasure purposes, building of lakes on farms. Sometimes I build a lake myself and sell it. Sometimes I build a lake for them.

"In connection with the work, have had occasion to familiarize myself with lands and vicinities susceptible to the impounding of water. . . . Land that is suitable for water impounding, in connection with other lands, adjacent or by itself, has, and had in 1930, an additional value.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Elm creek had some springs in it. Another thing is the drainage there. I would say from the standpoint of drainage area of this locality that the Miltimore land and adjacent land were adaptable for impounding water. . . .

"In my opinion the general character of the site upon which and of which the Miltimore land was a part is a very good lake site. In my judgment, based upon my general knowledge of the use for which real estate may be devoted, and based upon the testimony I have given, the most valuable use or purpose for which 94.3 acres of the Miltimore land could be adapted was for lake-site purposes. That would be true whether the lake was built or not."

In *New York v. Sage*, 239 U. S. 57, 61, 60 L. Ed. 140, 146, which grew out of condemnation proceedings to provide a part of the site for the same Ashokan reservoir involved in the McGovern case, it was said:

"  .  .  .  No doubt when this class of questions first arose it was said in a general way that adaptability to the purpose for which the land could be used most profitably was to be considered, and that is true. But it is to be considered only so far as the public would have considered it if the land had been offered for sale in the absence of the city's exercise of the power of eminent domain. The fact that the most profitable use could be made only in connection with other land is not conclusive against its being taken into account, if the union of properties necessary is so practicable that the possibility would affect the market price. But what the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact—not what a tribunal at a later date may think a purchaser would have been wise to give, nor a proportion of the advance due to its union with other lots. The city is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain. Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give."

In the recent case of *Olson v. United States*, 292 U. S. 246, 54 S. Ct. 704, certain properties bordering on the Lake of the Woods in Minnesota had been subjected by the federal government to easements of flowage. The landowners, being dissatisfied with the condemnation awards, invoked *certiorari*. In discussing the landowners' right to just compensation and what should be considered in determining that matter, Mr. Justice Butler said:

"The sum required to be paid the owner does not depend upon the uses to which he has devoted his land, but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. (*Mississippi & R. R. Boom Co. v. Patterson,* 98 U. S. 403, 408, 25 L. Ed. 206; *Clark's Ferry Bridge Co. v. Public Service Commission,* 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; 2 Lewis, Eminent Domain, 3d ed., § 707, p. 1233; 1 Nichols, Eminent Domain, 2d ed; § 220, p. 671.) The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. (*New York v. Sage,* 239 U. S. 57, 61, 36 S. Ct. 25, 60 L. Ed. 143.) It is common knowledge that public-service corporations and others having that power frequently are actual or potential competitors not only for tracts held in single ownership, but also for rights of way, locations, sites, and other areas requiring the union of numerous

parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemners affects market value, it is to be taken into account." (78 L. Ed. 825, 829, 54 S. Ct. 708, 709.)

Later in the same opinion Mr. Justice Butler cited and quoted from the earlier instructive case of *Boom Co. v. Patterson,* 98 U. S. 403, 25 L. Ed. 206, in which it was held that the peculiar adaptability of land to a public purpose should be taken into account in determining its value, the court (Mr. Justice Field) saying:

"We do not understand that all persons, except the plaintiff in error, were precluded from availing themselves of these lands for the construction of a boom, either on their own account or for general use." (p. 408.)

And so here. The jury's first special finding was that the most valuable use for which plaintiff's farm was adapted was "for impounding water." This finding cannot fairly be construed to mean that it was only adaptable for use as a part of a site for impounding of water for the city of Augusta, and the evidence adduced would not have justified a finding so limited.

Another error urged is based on the amount of the verdict. The city contends it was excessive. However, there was testimony that lands situated like plaintiff's, suitable for reservoir sites, were worth from $125 to $250 per acre. The jury found its value to be $100 per acre. There was, in fact, testimony that the land taken was mostly good bottom land and suitable for alfalfa, and worth $100 per acre for agricultural purposes. It follows that the error based on an excessive verdict does not appear. (20 C. J. 1210.)

Turning next to the cross-appeal, the trial court did not allow interest on the total final award, $10,087, but only on that part of it which was in excess of the sum deposited with the city treasurer, $4,894.50, pursuant to the award of the condemnation commissioners. Presumably this ruling was based on the fact that since the smaller sum was available to plaintiff by simply calling for it he was not entitled to interest thereon for the period it lay in the city treasury awaiting his demand. But suppose he had drawn the money as soon as it was available. What would have happened to his appeal? Any tyro in the law could tell him that such an act on his part would be tantamount to an unqualified acceptance of the award and thus utterly defeat his appeal. (*Hyland v. Hogue,* 131 Kan. 512, 292 Pac. 750; *Wilhite v. Judy,* 137 Kan. 589, 21 P. 2d 317; *Clothier v. Wallace,* 137 Kan. 928, 22 P. 2d 462.) In *Paulson v. McCormack,* 133 Kan. 523, 526, 1 P. 2d 259, it was said:

"Time and again it has been held that anything that savors of acquiescence in a judgment cuts off the right of appellate review." (p. 526.)

In view of this rule of law the sum of money on deposit with the city treasurer to pay the first condemnation award was as effectually held beyond the reach of plaintiff as if payment had been denied. We have had to consider cases like *Reisner v. Union Depot & Rld. Co.*, 27 Kan. 382, and *Lee v. Missouri Pac. Rld. Co.*, 134 Kan. 225, 5 P. 2d 1102, where the landowner was dissatisfied with the condemnation award allowed and deposited payable to his demand, and where, on appeal, the trial court and jury allowed him *less* than the condemnation award. Obviously in such cases the landowner was not entitled to interest; but just as obviously the rule of those cases should not be applied where the landowner has appealed and vindicated his right to a larger award. In *Gulf Railroad Co. v. Owen*, 8 Kan. 409, the landowner appealed from the condemnation award and eventually obtained a higher amount for his lands taken and damaged. This court held he was entitled to interest on the total amount of the final award, and said it "would have made no difference that the company had deposited the amount of the valuation and assessment with the treasurer of the county." (p. 419.) In accord with this early case were *W. & W. Rld. Co. v. Kuhn*, 38 Kan. 104, 16 Pac. 75; *Calkins v. Railroad Co.*, 102 Kan. 835, 172 Pac. 20; and *Fleming v. Ellsworth County Comm'rs*, 119 Kan. 598, 240 Pac. 591; and nothing this court has later said can fairly be construed to lessen its potency, although in *Lee v. Missouri Pac. Rld. Co.*, at page 233, we noted the fact that the authorities on this subject are not all to one effect. It follows that interest on the full amount, $10,087, should have been allowed, and the cause will be remanded to the district court to modify its judgment in this respect; and when so modified it will be affirmed. It is so ordered.