No. 32,497

C. D. Paul, *Appellant*, v. The Western Distributing Company, *Appellee* and *Cross Appellant*.

(52 P. 2d 379)

Opinion filed December 7, 1935.

*Paul H. White, Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester L. Morris, George B. Powers, Carl T. Smith, C. H. Morris,* all of Wichita, and *R. C. Woodward,* of El Dorado, for the appellant.

*A. M. Ebright, P. K. Smith, Bernard Peterson,* all of Wichita, and *L. J. Bond,* of El Dorado, for the appellee and cross-appellant.

The opinion of the court was delivered by

WEDELL, J.: This was an action for damages resulting from personal injuries due to a gas explosion. Both parties have appealed.

Plaintiff obtained judgment in the sum of $1,313. He is dissatisfied with the amount, and appeals from the judgment of the trial court overruling his motion for a new trial on the single and separate issue of damages only. Defendant appeals from judgment against it on assignments of error to be mentioned later. Plaintiff contends defendant is precluded from its cross-appeal for reasons to be stated hereafter.

The material evidence introduced by plaintiff was that plaintiff was injured as a result of a gas explosion in the basement of the Methodist church at Augusta on the 27th day of February, 1934. Defendant owns a gas-distributing system in Augusta, and the Methodist church was one of its customers. Defendant's gas lines run to the property line of the church. It has two meters, one to the east of the church, and the other in the southeast corner of the church basement. The explosion occurred in the northwest corner of the basement. In this corner is a room used by the Men's Bible class on Sundays, and by Boy Scouts during the week. A gas stove was located in the fireplace with a pipe which connected it to the flue. The basement had in it, also, a furnace and cook stove. The explosion occurred on Tuesday, February 27. On the previous Wednesday, February 21, Ralston, the janitor, testified he went to

the gas company's office and told Gillespey, its local manager, he had been smelling gas in the basement of the church for two or three months. He says he told the manager there was a leak and he would like to have it fixed. Gillespey says the janitor met him at a drug store and that the janitor asked him if the gas company would take care of it. At any rate, Gillespey told the janitor the plumbers did not like to have the gas company do such work and he should get someone else to fix the leak. This conversation took place at about two o'clock in the afternoon of February 21, and the janitor then went to the hardware store of Paul & Penley and talked to plaintiff Paul about the leak. Paul was a member of the church. Paul suggested to the janitor that he get a man by the name of Kelly to fix the leak. The janitor accepted plaintiff's suggestion and made arrangements with Kelly to fix the leak. The next day, February 22, Kelly went to the church and the janitor took him to the northwest room in the basement and then left. Kelly was there about half an hour and afterwards told the janitor he had fixed the leak. (Defendant in its brief says Kelly told Gillespey that he had fixed the leak. We are unable to find evidence in the record concerning that conversation between Kelly and Gillespey). The church paid Kelly for his services.

Kelly was subpoenaed by the defendant, but was not found. His evidence of what he did is therefore lacking. Counsel for plaintiff in his opening statement said:

"Mr. Kelly went down to the church at the time he was called and found that there was evidently a loose coupling or union near the place where the stove connected on to the pipe, and he turned it and the gas made a sizzling noise and he got a wrench and tightened it."

On Friday, February 23, the Reverend Mr. Moore, the pastor of the church, called Gillespey and told him he had smelled gas in the basement of the church. Gillespey told Mr. Moore that Ralston had previously talked to him about it, and that he, Gillespey, had told the janitor to get someone to fix it. Later in the trial Gillespey was asked, "In your conversation with Doctor Moore, on Friday, did you say anything about Ralston having *phoned* you or what you had told him or what he had told you?" Witness answered: "I don't remember whether I did or not." On Friday evening, Ralston, the janitor, talked with Mr. Moore, and when asked if there was a leak in the basement he told Mr. Moore there was, but he had it fixed. The pastor said it must be a hold-over where the gas smelled.

On Sunday, February 25, the church services were held as usual. About twenty men met and used the northwest basement room. The furnace and the gas stove in the northwest room were used that morning. There is no evidence in the record before us that there was any smell of gas in the church on that Sunday or in the classroom. McCray, who was injured with the plaintiff, Paul, at the time of the explosion, is a trustee of the church. McCray testified that he attended the Men's Bible class that Sunday morning, and did not detect any smell of gas.

On the following Tuesday, February 27, the plaintiff and McCray went to the northwest basement room, according to their testimony, for the purpose of fixing the isinglass in the gas stove. The plaintiff, Paul, knew there had been a leak in this room, but believed Kelly, the man he recommended to the janitor, had fixed it. Plaintiff testified the janitor said he was going to get Kelly to fix it and that he relied on the fact that Kelly had fixed the pipes or whatever was wrong, and for that reason did not think there was any gas there. The plaintiff further testified that he had heard, or Ralston, the janitor, had told him, that Kelly had been there and had done some work. Neither the plaintiff nor McCray smelled gas when they entered or while they were in the northwest room on February 27, the morning of the explosion. They opened the door to the room but did not turn on the electric lights. The electric lights were attached to the ceiling and were not sufficiently bright to disclose what they desired to examine on the inside of the stove door for the purpose of removing and replacing the isinglass in the stove door. They were examining the stove when plaintiff bent down and struck a match, after which an explosion occurred. The flames encircled them and burned much of their clothing. Plaintiff suffered burns on his hands, wrists, ankles and on a knee. He also suffered burns on his face and neck. His hearing was affected and the scars on his face caused the eyelids to droop. An eye specialist testified his eyes moved normally, pupilary reflexes were normal and he had normal vision in each eye, but that the primary trouble with his eyes was due to the fact the minute scars pulled the lower lids away from the eyeball, so the tear ducts did not come in contact with the eyeball, as they have to in order to function and drain the tears from the eyes. He further testified that an operation would be necessary to correct the condition. He said he had performed about fifty such operations and had never failed to get

improvement, although he had failed in some instances to get an entire recovery, and that the cost of such an operation and total expense would be about $200.

An orthopedic surgeon testified concerning the burns on plaintiff's hands and stated that the right hand was disabled about 75 percent, the left hand, 35 percent, and that both hands could be improved provided surgical treatment were undertaken. He questioned whether plaintiff would be able to do intricate work with his fingers and that while the appearance of his hands would whiten a little, the skin would remain thin. He said the operation would cost between $150 and $200.

There was evidence concerning pain and suffering. The evidence also showed the amounts plaintiff had actually incurred for medical, hospital and nurse's services. The hospital bill was $456.10, Doctor Holt's bill was $263, Doctor Seydell's bill was $10, Doctor Lutz's bill was $5, special nurse, $13, or a total of $747.10. The above bills had been paid. There was no evidence as to charges of Doctor Rombold and Doctor Brownell. There was no evidence that any arrangement had been made to have the operations performed which were suggested by the surgeons. The case was tried about one year after the accident occurred.

Plaintiff had been in the hospital about seven weeks and also asked compensation in the sum of $147 for his wife, who had taken care of him in place of a nurse, subsequent to the first two days of his injury. She testified also that her expenses incurred while staying with him at the Wichita Hospital were between two and three dollars a day.

Plaintiff testified that he was a member of the firm of Paul & Penley, engaged in the hardware business at Augusta, and that by reason of his interest in that firm he had been drawing $100 per month both before and after the accident. He was an expert electrician and had received seventy-five cents an hour for such work. He stated he had been producing three or four thousand dollars a year for the firm by reason of his electrical work, but that there had not been much electrical work for some time. He received $100 per month from the firm whether he did electrical work or not. This, however, was by reason of his interest in the firm. He stated that he was in the store every day waiting on customers, and supervised whatever electrical work was done, and that he went to work at about eight o'clock in the morning and stayed until five

or six in the evening. The foregoing constitutes the material portion of plaintiff's evidence.

There was defense evidence that defendant had tested the pipes after the explosion, and that there was a large amount of gas leakage at that time; the explosion tore up part of the concrete floor; the only leaks found after the explosion were in the pipe under the concrete floor; if there had been that much leakage before the explosion it probably would have blown up the church; if the janitor had gone to the office and reported a leak an investigation would have been ordered; defendant's records showed no complaint; the reason for not making an investigation was not due exactly to the fact the janitor had not reported to the office, but because he did not offer it as a complaint and just mentioned it casually and wanted to know what could be done about it; it was suggested he get some one to fix it; if it had been made as a complaint the company would have investigated it; there was nothing in the manner, words, gestures and actions of the janitor on February 21 that led Gillespey to believe there was a dangerous and hazardous condition existing in the church.

The janitor also testified on behalf of defendant that he talked with Mr. Moore on Friday night (February 23), following the day the janitor talked to Gillespey and that Mr. Moore asked him whether there was a leak in the basement and that he told Mr. Moore he had it fixed and that Mr. Moore said, "It must be a hold-over where the gas smelled."

There was also defense testimony that when gas is present in a building so that the odor can be detected it is a condition that should be investigated. There is much other testimony in this record, but we do not deem it necessary to narrate it for the purpose of properly determining the questions presented on this appeal.

The jury returned answers to special questions as follows:

"1. When did the defendant first receive notice or knowledge that there was a leak in the basement of the church? A. February 21, 1934.

"2. If you find that prior to plaintiff's injuries someone other than the defendant did inspect and repair said leaks, then state: (a) Who undertook to do such work? A. Kelly. (b) Who employed and paid such person for his work? A. M. E. Church (Janitor Ralston) M. E. Church treasurer. (c) When was the work done? A. Thursday, February 22.

"3. What facts or information concerning a leak in the church building did defendant have that was not within the knowledge of the plaintiff? A. Second notice through the Reverend Moore.

"4. Was the condition in the gas pipes in the basement from February 21, 1934, to February 27, 1934, considered dangerous and hazardous by: (*a*) Ralston, the janitor? A. No. (*b*) Paul, the plaintiff? A. No. (*c*) Gillespey, the defendant's agent? A. Yes."

The verdict was for the sum of $1,313. Plaintiff says this verdict decides the issue of defendant's negligence. In the light of what we shall say later, we deem it unnecessary to determine that question. Let us assume, however, for the subject just now under consideration, that negligence has been established. Plaintiff filed motion for new trial on the separate issue of damages alone. This motion the court overruled. Plaintiff contends a new trial can be granted on one of several separable issues. That is conceded. (R. S. 60-3004; *Bracken v. Champlin,* 114 Kan. 882, 220 Pac. 1027; *Brockmann v. Lawson,* 117 Kan. 386, 232 Pac. 601; *Friesen v. Western Grain Dealers Ins. Co.,* 119 Kan. 513, 240 Pac. 414; *Fontana v. Integrity Mutual Casualty Co.,* 120 Kan. 406, 243 Pac. 1035; *McGarr v. Schnoor Cigar Co.,* 125 Kan. 760, 266 Pac. 73; *Wagner v. Clay County Commissioners,* 128 Kan. 127, 276 Pac. 74; *Carlgren v. Saindon,* 129 Kan. 475, 283 Pac. 620; *Converse v. Wichita Gas Co.,* 132 Kan. 291, 295 Pac. 635; *Durkin v. Kansas City Public Service Co.,* 138 Kan. 558, 27 P. 2d 259.)

Damages and negligence are separable issues. This court has frequently held that the above statute applies where the only issue *remaining undetermined* was the amount of damages. (See last above-cited cases.)

Plaintiff contends that a separate trial should have been granted on the issue of damages alone. R. S. 60-3004, insofar as here applicable, reads:

"A new trial *shall not be granted* as to any issues in a case unless on the pleadings and all the evidence offered at the trial and on the motion for a new trial *the court shall be of the opinion* that the verdict or decision is wrong in whole or in some material part, and the new trial shall be only of the issues as to which the verdict or decision appears to be wrong, when such issues are separable."

This statute makes it plain that a new trial shall not be granted unless the trial court is of the opinion the verdict or decision is wrong in whole or in some material part. It is therefore clear that much is left to the discretion of the trial court. In discussing the above statute this court in the case of *Brockmann v. Lawson,* supra, said:

"The order will not be modified so as to compel a new trial *as to the*

*amount of damages only* where it does not appear that the court abused its discretion in granting a new trial as to all issues in the action." (Syl.)

In the course of the opinion this court further said:

"If a trial court has discretion in granting new trials, it follows that the court has like discretion in determining whether the new trial shall be granted as to only part of the issues." (p. 388.)

In the case of *Durkin v. Kansas City Public Service Co.*, supra, this court, in construing the provisions of R. S. 60-3004, said:

" 'The allowance or denial of a motion to set aside a judgment and grant a new trial is a matter resting in the sound discretion of the trial court, whose action thereon will not be reversed unless an abuse of such discretion is apparent.' (*Bateman v. Preisser*, 123 Kan. 217, 254 Pac. 1028.)" (p. 562.)

In the instant case the trial court overruled the motion for new trial on a material part of the verdict, namely, the issue of damages only. It must therefore be assumed the trial court, in the light of the pleadings and on all the evidence and in consideration of all that was said and done at the time of the motion for new trial, was of the opinion the verdict was not wrong as to the separate issue of damages. That does not mean the trial court might not have sustained a verdict for a larger sum. It does mean the trial court at least did not consider it wrong to the extent it was willing to disturb the wishes and opinion of the jury as reflected by its verdict. Shall we say this view of the case, in consideration of the entire record, constituted an abuse of sound judicial discretion on the part of the learned trial court? We do not think so. There is no showing here and none was made to the trial court that this jury was swayed by passion or prejudice against the injured plaintiff and in favor of the defendant corporation. Such prejudice would be indeed a most novel situation in a personal-injury case against a corporation. There is no complaint concerning the admission or exclusion of evidence; no complaint is made here by plaintiff regarding the instructions. There is no indication the jury did not follow the instructions. Plaintiff says the jury did not follow the instructions. He says the verdict for $1,313 covered only medical and hospital expenses. The evidence, as heretofore narrated, is clearly to the contrary. Plaintiff calls attention to the following portion of the court's instructions relating to the subject of expenses:

"Plaintiff further alleges that he incurred expenses for nursing, medical services, and hospital in the sum of $1,313, that he was damaged in the sum of $25,000, for which sum he asks judgment against the defendant."

The above portion of the instructions simply covered what plaintiff claimed in his petition. Plaintiff omits the instruction which immediately follows the above quotation, and which omitted portion contains the specific instruction as to the measure of damages on the subject of expenses incurred. It reads:

"If you should find for the plaintiff, in determining the amount, you will take into consideration the *expense he has incurred for medical and hospital service,* the pain and suffering which he has endured as a result of his injuries, and if permanently injured this should also be taken into consideration. No definite rule for determining damages for pain and suffering or permanent injury can be stated, but it is a matter wholly within the discretion of the jury and for the jury to determine, and ·in this case if you find the plaintiff entitled to recover at all, then you will allow him just such amount as you feel will reasonably compensate him for his pain and suffering and for his permanent disability, if you find that he is permanently disabled, in addition *to his expenses so incurred* by reason of his injuries. . . ." (Italics inserted.)

The evidence is plaintiff incurred medical and hospital expenses and doctor bills in the exact sum of $747.10. There was evidence that his wife incurred additional expenses by reason of being at the Wichita Hospital where she could wait on plaintiff, in the sum of $2 or $3 per day for seven weeks. Assuming she spent $2.50 per day, her expenses in this connection would have been $122.50 or a total expense of $868.60. This constitutes the total expenses of all kinds actually incurred. That is what the instruction said he could recover.

Plaintiff urges he is entitled to recover for nursing services of his wife, which services he says took the place of a nurse. We are referred to no decisions that a husband is not entitled to his wife's services under such circumstances and our limited time for search has revealed none.

Plaintiff calls attention to possible prospective surgical expenses. There was testimony on that subject. Certainly plaintiff, as every other human being, is entitled to whatever future assistance, surgical and medical, science can supply to improve and, if possible, restore his previous physical condition. He had, however, incurred no such surgical expenses by the time of trial about one year after the accident. The jury allowed $443.40 in excess of all expenses incurred.

In the case of *Converse v. Wichita Gas Co.,* 132 Kan. 291, 295 Pac. 635, this court had occasion to consider the precise complaint of inadequate damages. In that case plaintiff also asked for a new

trial on the question of damages alone. Plaintiff in that case asked damages in the sum of $25,000. The jury returned a verdict in the sum of $1,250. Plaintiff had incurred expenses for doctors, nurses and hospital services in the sum of $480.70. It was contended the balance, $770, was inadequate to compensate for damages to health, physical condition, pain, suffering and prospective pain, suffering and loss of time and work. This court affirmed the ruling of the trial court denying a motion for a new trial on the separate issue of damages. It was said:

"There is no evidence that the jury was swayed by passion or prejudice; no misconduct on the part of the counsel; no evidence that the jury ignored entirely some one or more elements of damage that it should have considered." (p. 294.)

In the same opinion this court further said:

"Is it so inadequate as to compel the feeling of dissatisfaction with a revulsion from it at the mere contemplation? This question must be answered in the negative." (p. 295.)

In the case of *Van Vrankin v. Railway Co.*, 84 Kan. 287, 114 Pac. 202, the following language was applied to this exact issue:

"It is hard to measure the injury, and still harder to estimate it in dollars and cents, and in the absence of any showing of misconduct indicating passion or prejudice we must leave the matter as determined by the jury, who saw the appellee and heard her testify." (p. 292.)

In the case of *Hardwick v. Railways Co.*, 114 Kan. 843, 845, 220 Pac. 1043, this court, in disposing of a subject similar in principle, used the following language:

"There is no uniform yardstick, no hard and fast rule, by which the excessiveness of a verdict can be measured and determined as in ordinary mathematical calculations."

(See, also, *Ellis v. Kansas City Public Service Co.*, 131 Kan. 555, 292 Pac. 939.)

The same language is applicable to a complaint concerning an alleged inadequate verdict.

Plaintiff does not want a retrial on the issue of negligence. He is not willing to surrender what he terms an entirely inadequate or a mere medical and hospital expense verdict. He insists upon holding fast to what he has. This court is asked to overrule the trial court, completely separate the negligence and damage features of the case and grant him permission to go before another jury and to present to that jury the sole issue of damages. He could then argue

that all negligence features on part of this defendant corporation have been thoroughly and conclusively established by judgment and that all the jury need now consider is the terrible condition of this plaintiff and how much it will require to compensate him for damages sustained. While negligence and damages are legally separable issues and while this court has on numerous occasions granted new trials on the issue of damages alone, yet under all the circumstances in this case we do not believe such ruling would be fair to defendant. Defendant asks judgment on its demurrer to plaintiff's evidence, that answers to certain questions be set aside as not supported by the evidence, and for judgment *non obstante veredicto,* and contends that it should have been granted a new trial. Plaintiff says defendant, by reason of certain facts to be narrated later herein, is precluded from a cross-appeal. That contention, if true, does not preclude, and plaintiff does not contend that it precludes, defendant from objecting to a new trial on the single issue of damages. Under a similar situation this court in the case of *Friesen v. Western Grain Dealers Ins. Co.,* 119 Kan. 513, 240 Pac. 414, said:

"The evidence abstracted and the answers to the special questions disclose that the amount of damage sustained by the plaintiff is so intimately connected with other questions in the case that the amount of damage sustained by him cannot be tried separately and a just conclusion be reached. There is nothing to show that the trial court abused its discretion in refusing to grant a new trial on the question of damages alone." (p. 516.)

In consideration of the evidence disclosed by the entire record in this lawsuit we have no reluctance in saying the trial court did not abuse sound judicial discretion, and the denial of a new trial on the question of damages alone was eminently correct.

This brings us to a consideration of defendant's cross-appeal. Defendant urges various assignments of error. Plaintiff insists defendant is precluded from a cross-appeal. If plaintiff is right we of course need not consider defendant's contentions of error.

Plaintiff filed a motion here asking this court to dismiss defendant's cross-appeal. In support of that motion are attached affidavits which narrate the facts upon which plaintiff relies. On June 4, 1935, this motion was temporarily overruled. It was not overruled because the court was of the opinion it lacked merit, but because it did not desire to try the case in piece-meal fashion. The motion is before us now for the first time on its merits.

The basis of plaintiff's motion to dismiss the cross-appeal is the delivery of a check by defendant to the court clerk covering the amount of the judgment, including interest and costs. The check was left with directions. The affidavits were made by the court clerk and one of defendant's attorneys. They relate the facts concerning the check transaction. The affidavit of the attorney is in substance as follows: On March 25, 1935, he delivered to the clerk a check of the defendant company in the sum of $1,365.30 and at the time of delivery of the check stated to the clerk in substance, that in order to save costs of an execution *he would like to deposit the check with the clerk with the understanding that in case plaintiff took an appeal the check would be redelivered to affiant, as the defendant in that event desired to take a cross-appeal;* that. the clerk accepted the check under the above circumstances, but further stated that in order to protect himself, he would prefer to deposit the check and in case affiant requested the return of the money, *that he would then issue his own check* for the amount and deliver it to affiant; that the check was delivered to the clerk only upon the above conditions and subject to the rights of affiant to withdraw the same in case plaintiff took an appeal.

The affidavit of the court clerk is in substance as follows: After narrating the complete history, including all post-trial motions and rulings thereon, and the final judgment, in substance stated: No execution was ever issued upon the judgment, no praecipe for execution was filed, no stay of execution was requested by either party and no order for stay of execution or to supersede the judgment in any manner was ever made; on March 25, 1935, defendant and its attorneys delivered to affiant its check in the sum of $1,365.30, being the amount of the judgment, interest and costs; at the time of paying said sum into court the attorney for defendant stated *in the event plaintiff declined to accept the amount of his judgment* and appealed, defendant desired to withdraw the money *so paid; affiant cashed the check and deposited the proceeds thereof with the other funds in his hands as such clerk;* thereafter and on April 10, plaintiff filed his notice of appeal and acknowledgment of service of copy thereof on defendant; on April 18, affiant upon demand of defendant paid to defendant by check *drawn upon the account of affiant as clerk,* the sum of $1,365.30; at time of receiving such check, one of defendant's attorneys made and filed an affidavit, a true and correct copy of which was attached to affidavit.

It will be observed from the affidavits there is some difference in the version of just what the understanding was on the occasion of the delivery of the check. It illustrates exactly what misunderstandings may and do frequently occur between men of the highest integrity. It is just such experiences as this and a great many other varieties of incidents that make necessary a firmly established principle forbidding appeals under circumstances indicating previous acquiescence in judgments.

Plaintiff's contention in his motion to dismiss the cross-appeal was and now is—no execution having been issued, no praecipe for execution having been filed, no stay of execution having been requested, no stay order having been entered, the judgment not having been superseded in any manner—the delivery of the check to the court clerk was voluntary and bars an appeal. Plaintiff further urges this conduct constitutes acquiescence in the judgment that was rendered and further that this conduct is inconsistent with the cross-appeal and it is for that reason barred.

That the check was voluntarily deposited cannot be questioned. No execution had been issued and no praecipe for execution had been filed. In the case of *Round v. Power Co.*, 92 Kan. 894, 142 Pac. 292, this court ordered the case dismissed because the judgment for costs had been paid. It said: "It does not appear that an execution had been issued or that the payment made by plaintiff was involuntary." (Citing *Waters v. Garvin*, 67 Kan. 855, 73 Pac. 902; *State v. Conkling*, 54 Kan. 108, 37 Pac. 992; *York v. Barnes*, 58 Kan. 478, 49 Pac. 596.) The case of *Bank v. Bracey*, 112 Kan. 677, 679, 212 Pac. 675, was an action to recover on a note. The defense was the note had been procured by false representations. Judgment was rendered in favor of defendant and against plaintiff for costs. Plaintiff appealed and later paid the costs. A motion to dismiss the appeal was here sustained. This court said:

"The cashier pleads ignorance of the consequences of his conduct, and the board of directors of the bank declares it had no intention of abandoning the appeal. In no case in which an appeal has been dismissed was it the intention of the party recognizing validity of the judgment to prejudice his appeal, and in several instances the intention not to prejudice the appeal was expressly declared." (Citing *State v. Conkling*, 54 Kan. 108, 37 Pac. 992; *York v. Barnes*, 58 Kan. 478, 49 Pac. 596.)

In the case of *Hajny v. Hajny*, 117 Kan. 419, 232 Pac. 611, plaintiff recovered a money judgment and defendant asked for a stay of execution for six months pending an appeal. The court

granted the stay on condition defendant pay into court certain sums on certain dates. Defendant paid part of the money into court and then perfected his appeal. Appellant contended he was contesting only a part of the judgment rendered against him, and the sum paid represented the uncontested portion. This court said:

"The record does not sustain this contention. The defendant contested plaintiff's claim in its entirety and every element composing it, and denied that he owed plaintiff any sum." (p. 420.)

This court in that case further said:

"Appellee contends that this payment by defendant is such a recognition of the judgment as precludes him from contesting the validity of the judgment on appeal. The point is well taken. When a money judgment is rendered against a party to an action, he cannot pay the judgment and thereafter question its validity on appeal." (p. 419.)

In the case of *Hyland v. Hogue,* 131 Kan. 512, 292 Pac. 750, a suit was brought upon six separate and distinct items and plaintiff received judgment on one of them. He accepted the amount upon this one claim, receipted therefor in writing and in the receipt attempted to reserve his right of appeal as to the remaining items, with the following express condition written into the receipt: "This release not to affect remaining claim now in litigation and pending on appeal." On appeal as to the remaining items he contended the receipt clearly showed an intention not to be bound by the judgment, not to acquiesce therein and not to waive his right of appeal. This court dismissed the appeal and said:

"The rule is founded upon the well-established principle that litigants must be consistent. They cannot be permitted to change and shift their position in an inconsistent manner. *The orderly administration of justice is best advanced by a firm insistence upon this principle.* It is simply an application of the homily that one cannot eat his cake and have it." (p. 515.)

In the case of *Wilhite v. Judy,* 137 Kan. 589, 21 P. 2d 317, plaintiff was arrested for a traffic violation and posted a $7.50 bond. He was convicted and fined $3.50. He had authorized the chief of police to take the fine and costs out of the cash bond he had posted. This was in writing. The chief of police did so and placed the money with the city treasurer. Thereafter appellant attempted an appeal to the district court where his appeal was denied. This court held:

"The payment [of the fine] constituted an acquiescence of the judgment and necessarily defeats an appeal." (p. 590.)

In the case of *Paulsen v. McCormack,* 133 Kan. 523, 1 P. 2d 259, plaintiffs sued in ejectment and were defeated. Judgment was entered against plaintiffs for costs. *One of the plaintiffs* paid the costs and the other appealed. A motion to dismiss was filed here accompanied with an affidavit which stated no execution was issued upon the judgment, no praecipe for execution had been filed and no stay of execution was requested or ordered. This court dismissed the appeal. It said:

"To get out of this dilemma counsel predicate an argument on what they choose to characterize as the involuntary payment of the costs by one of the appellants. But the adjective 'involuntary' does not fitly apply. There was no impending levy upon the property of Mary to satisfy the judgment, no execution had been issued, nor praecipe for execution filed. It was simply a case where apparently a final judgment ought to be satisfied, and no record reason then existed why it should not be satisfied. . . . Time and again it has been held that *anything that savors of acquiescence in a judgment cuts off the right of appellate review,* and payment of costs by a defeated litigant falls in that category. . . . Moreover, it is so very easy in this state to procure a stay of execution, supersedeas, or the like, which would halt an execution for costs, that we are constrained to believe that in those jurisdictions which hold that satisfaction of a judgment for costs does not constitute such an acquiescence in the judgment as ·to preclude an appeal the facility with which a stay of execution can be obtained in this state does not exist." (pp. 526, 527.)

See, also, *Miltimore v. City of Augusta,* 140 Kan. 520, 38 P. 2d 675.

Defendant urges that it deposited the check because it is a public service corporation and could not permit an execution to be issued on the judgment rendered, and to avoid additional expense and to prevent embarrassment and unfavorable publicity that would result on the issuance of an execution and that the check was delivered upon the conditions stated in the affidavits.

If the check was intended to avoid an execution then it must follow that the check was intended to be used in payment of plaintiff's judgment in the event a praecipe for execution was filed. If the check was delivered to the court in order to avoid additional expense and to prevent embarrassment, that would result on the issuance of an execution, then again it must have been intended by defendant to have the check used in payment of plaintiff's judgment. Can it be logically contended this conduct does not savor of acquiescence?

Defendant relies upon the cases of *Feight v. Wyandt,* 79 Kan.

309, 99 Pac. 611; *Bank v. Bracey,* 112 Kan. 677, 212 Pac. 675; *Hajny v. Hajny,* 117 Kan. 419, 232 Pac. 611. The first case is not in point. In that case the motion to dismiss the cross-appeal was denied because the payment was after execution had been issued and this court held the payment was involuntary. In the last two cases cited the motion to dismiss was sustained by this court on the principle of acquiescence. These cases do not support defendant's contention.

Webster's New International Dictionary defines acquiescence as, "Passive compliance or acceptance: . . . . distinguished from avowed consent on the one hand, and, on the other, from opposition or open discontent." The delivery of the check constituted not only passive compliance with a judgment in the sum of $1,313 and interest, but it represented satisfaction with and avowed consent to that judgment, coupled with directions to pay that amount to plaintiff if he would accept it. If that was not the purpose of the check it was absolutely useless and without function. This construction is clearly disclosed by the version of the clerk as to his understanding of the matter. He said: "In the event plaintiff *declined to accept the amount of the judgment and appealed* . . . defendant desired to withdraw the money so paid." That is not all the delivery of the check represented. Judgment had been rendered against defendant for costs. The check in the sum of $1,365.30 covered the court costs. Can it be said this does not savor of acquiescence? In the case of *Bank v. Bracey,* supra, this court reviewed the earlier cases on the subject. In the light of what was said there and subsequently on the same subject, under numerous and varying circumstances, it must be plain this court has no inclination to diminish or impair a principle which to it appears both salutary and sound. The principle is whatever savors of acquiescence in a judgment in whole or in part, precludes appellate review. The cross-appeal must therefore be dismissed. The judgment of the trial court denying plaintiff's motion for a new trial on the issue of damages alone is affirmed.