384

Arthur J. Schmitt, Appellee and Cross Appellant, v. J. Pilling Wright and Continental Diamond Fibre Company, Appellants and Cross Appellees.

Gen. No. 42,045.

Burke, P. J., dissenting.

Opinion filed January 6, 1943. Rehearing denied February 9, 1943.

Rosen, Francis & Cleveland, of Chicago, for appellants and cross appellees; John F. Rosen and James B. O'Shaughnessy, both of Chicago, of counsel.

Tenney, Sherman, Rogers & Guthrie, of Chicago, for appellee and cross appellant; George T. Rogers and L. Dow Nichol, Jr., both of Chicago, of counsel.

Mr. Justice Hebel delivered the opinion of the court.

This is an appeal by the defendants from a decree entered by the court confirming the master's reports, decreeing that certain real estate, machinery and equipment be impressed with a trust and ordering that the cause be referred to a master to take an accounting upon the basis fixed by the decree.

The plaintiff on November 29, 1932, filed his original complaint in chancery against the present defendants and others. He asked for a decree (1) granting him leave to redeem certain capital stock in Walnart Electric Mfg. Company from a chattel mortgage; (2) for an accounting; and (3) for a conveyance of certain real estate and personal property to the stockholders of the Walnart Company. Certain amendments were filed by plaintiff to the original complaint. General and special demurrers were filed by defendants. The general demurrer and a special demurrer based on laches were sustained by the court and a decree entered dismissed the complaint for want of equity. An appeal was taken by plaintiff to the Illinois Supreme Court, which held that no freehold was involved and transferred the cause to this court. (*Schmitt v. Wright*, 357 Ill. 509.) Subsequently this court reversed the decree and remanded the cause. (*Schmitt v. Wright*, 283 Ill. App. 628 (Abst.) After

remandment on January 24, 1938, plaintiff by leave of the trial court, filed the amended complaint now before this court. The amended complaint asked for a decree (1) granting leave to plaintiff to redeem certain capital stock of Walnart Electric Mfg. Company held by defendants under an agreement of May 4, 1925; (2) for an accounting; and (3) that a trust be declared in certain real estate and personal property in favor of plaintiff, and that the same be ordered conveyed to plaintiff and other stockholders of Walnart. Thereafter the suit was dismissed as to all defendants except Continental-Diamond Fibre Company, a corporation, and Wright, appellants here. Answers of defendants to the amended complaint were subsequently filed. The cause was referred to a master in chancery to take proofs on the questions raised by the pleadings as to the right of plaintiff to relief and, if it was determined that plaintiff was entitled to an accounting, to report his conclusions as to the proper scope and basis for such accounting. Testimony was taken before the master and after arguments the master made his original report. Objections to the report were filed by defendants, some of which were sustained and others overruled. The master, acting upon such objections, made a supplemental report to which both plaintiff and defendants filed objections. These objections, with one exception, were overruled by the master. By order of court the overruled objections of defendants and plaintiff to the master's reports were made exceptions in the trial court. These were argued in the trial court and were overruled by it with one exception (not material on this appeal), and the decree above mentioned was entered by the court, from which decree defendants appeal, and from which plaintiff takes a cross-appeal.

The theory of plaintiff's case is that defendants took over, held and operated the Walnart properties as security for the payment of a debt, under a con-

tract that entitled them to hold and operate the business and properties for a period of four years, unless such indebtedness should be paid sooner, either through the operation of the business, or by the plaintiff; that during this period defendants made huge profits, both through conducting the business and from materials which they (as operators of Walnart) purchased from themselves at prices from 10 per cent to 20 per cent above those charged to others; that these profits were largely in excess of the amount of the indebtedness; but that instead of returning plaintiff's stock in Walnart to him, as agreed, they wrongfully took over while still acting as trustees the business, customers, secret processes, patents, and all of the other properties as their own, without the payment of consideration and without accounting to plaintiff and to other stockholders of Walnart therefor.

The defendants' theories of the case are that the May 4, 1925 contract did not create a trust relationship; that the intention expressed in the instrument is controlling; that the contract gave defendants the express power and right at any time after its date to sell or liquidate the Walnart business, with or without plaintiff's consent; that neither did the true circumstances under which the contract was made create an implied trust in the Walnart business, and that even if there was a trust, plaintiff (under his theory the *cestui que trust*) expressly consented to the sale of the Walnart business, voluntarily executing on behalf of Walnart, documents of conveyance; that these documents constituted actual conveyances and were understood by plaintiff to be such before and after their execution; that plaintiff did not question these conveyances within a reasonable time after they were made but, having full knowledge of all of the material facts, waited for a period of approximately six years after he executed the documents before making any protests or contentions; that, if these documents were

valid, plaintiff was not entitled to relief because his entire theory was predicated upon the proposition that Walnart was entitled to profits made in the operation of the Walnart premises after September 30, 1926, the date of the bill of sale; that the opinion of the Appellate Court on the first appeal is not *res adjudicata* on the question of the existence of a trust, because (1) the case was not decided in this court on its merits (the allegations of plaintiff in his original complaint, as amended, before this court having been, on demurrer, taken as true); (2) the allegations, theory and prayer of the amended complaint and the proof in their support now before this court, are essentially different from the case before the court on the former appeal; and (3) the order of this court reversing and remanding the cause was not appealable; that on plaintiff's trust theory, the relationship of the parties was, in any event, terminated in May 1929, when defendants disposed of the remaining Walnart assets pursuant to plaintiff's express direction that this be done; and that if plaintiff ever did have a cause of action, it was barred by his subsequent laches and course of conduct.

Plaintiff suggests with reference to his cross-appeal that defendants' counsel's statement that the master held the taking over by defendant of the properties in 1926 to be a sale, is based upon their own construction of the master's language in his supplemental report and not upon what the master says. It is contended by plaintiff that what the master says, in his supplemental report is that plaintiff is not entitled to an accounting for profits made by defendants after October 1, 1926, but only to an accounting for the use of the business, building, machinery and equipment after October 1, 1926. That the argument made by defendants' counsel is that the master intended by this language to hold that the instrument which counsel call a bill of sale "constituted a valid sale as

far as the profits after October 1, 1926, were concerned, but nevertheless found that it was not a valid sale as far as tangible assets described in the bill of sale were concerned.'' Plaintiff urges that the decree materially modified the foregoing finding of the master by providing for the consideration of the profits in measuring the value of the use, which fact counsel has failed to mention. It is further urged that that language of the master or the language of the decree cannot be construed to mean that the so-called sale was valid and that defendants, as trustees, were entitled to keep all profits wrongfully made by them from the trust. However, since there is a difference of opinion as to the construction of the above language, plaintiff asks this court to clarify it, or if this court believes that said language is susceptible of the construction that defendants' counsel give it, then to reverse that paragraph of the decree (paragraph C) and to state the correct rule of law. The cross-appeal is filed solely for that purpose.

The conclusions of the master's report and the decree are substantially as follows: The master found against plaintiff respecting three of the material allegations of his complaint and of his theories, finding in effect that (1) plaintiff had not sustained his allegation that defendants represented to plaintiff prior to the execution of the May 4, 1925 contract that Walnart could pay for Continental materials purchased on credit at its convenience; (2) that plaintiff had failed to prove that the September and October 1926 bill of sale and lease were secured on defendants' representations that they were to be used by defendants for the purpose of facilitating the operation of Walnart by defendants for Walnart's benefit; and (3) (passing upon plaintiff's theory which is the basis of his case) that Walnart was not entitled to the profits in the operation of Walnart premises by Continental after the date of the bill of sale and lease. Not-

withstanding the master's finding that the bill of sale was a good conveyance he recommended that defendants ". . . account for the assets, business, goodwill, patents and patent-rights, taken by defendants under the assignment or bill of sale." Defendants suggest that this recommendation was apparently predicated on the master's opinion that the Walnart assets were trust property; and that he so concluded largely because of this court's opinion on the first appeal. It was the master's opinion that the law relating to trusts was applicable, this law being construed by him as to entitle plaintiff to relief.

The defendants in their brief recited a number of facts as being undisputed but call attention to matters that are in dispute, and from defendants' theory it is these admittedly disputed factual matters which are the subject of this controversy. For the purpose of determining whether the court was in error in entering the decree, these disputed matters of fact must be considered. These factual matters in dispute, as recited in defendants' brief, are as follows: (1) The contention of plaintiff that he was the inventor of a secret process which Continental was desirous of obtaining for its own uses and the implication that defendants' acts which followed their learning of this process were done in pursuance to a plan to appropriate the invention to their own uses. (2) The contention of plaintiff that Continental urged Walnart to accept shipments of raw material from Continental on credit upon the understanding that they could be paid for by Walnart at its convenience. (3) The contention of plaintiff that his signature to the May 4, 1925 contract was procured by means of threats of bankruptcy proceedings by defendants. (4) Plaintiff's contention that defendants kept secret from plaintiff information respecting the conduct of the business from May 4, 1925 until September 1926 and that plaintiff was without knowledge of Walnart affairs during

that period. (5) The contention of plaintiff that the September 30, 1926 lease and the October 1, 1926 bill of sale were not intended to be absolute conveyances, but that the intention was that they were to be used by Continental for the purpose of effecting economies in Walnart operations and of facilitating the operation of the Walnart plant for the use and benefit of Walnart. (6) The contention of plaintiff that he first obtained knowledge of the matters upon which he predicated his complaint shortly before the filing of his suit.

The first matter before this court for consideration is whether under the May 4th contract the stock of plaintiff was pledged as security for the payment of a debt owing by Walnart Electric Mfg. Co. to Continental Fibre Company. And, if so, whether the pledgees, when they entered into possession of the business and properties and assumed full and sole control of the management, business, employment, purchases and all other business relating to and concerning the Walnart Company, then held the stock and the business and properties in a fiduciary capacity, subject to all the duties and liabilities of trustees. In plaintiff's argument it is urged that defendants, in their brief on the former appeal, presented and argued the same question that is presented in Point I of their present brief, *i. e.,* that the May 4, 1925, contract did not create a trust; that this court thereupon construed the contract to create a trust; and that since then the circuit court and the master have construed it in the same way.

Upon defendants' argument on the former appeal (*Schmitt v. Wright,* 283 Ill. App. 628 (Abst.), that the contract constituted a sale, both of plaintiff's stock and the business and properties of the Walnart Company, this court said:

"It is well to consider in this connection that there was no absolute transfer of the properties of the

Walnart Electric Manufacturing Company, but that the transfer took place only to secure the payment of the amount due to the Continental Fibre Company.''

Plaintiff goes on to discuss the facts and says that in some of his letters, Wright stated that plaintiff's only right was to exercise an option to repurchase the properties, but in the same letters he spoke of the contract as made to secure a debt. It was upon the theory that the contract was a sale with an option to plaintiff to repurchase that the defendants claimed the right to all profits made by Walnart. However, Wright told plaintiff in his letter of January 12, 1927, that Walnart was entitled to the profits made by it, and in his letter of January 28, 1929, he told plaintiff that the purpose of the contract was to secure Continental and make the Walnart Company able within a period of four years to repossess their property. It is urged that there is no ambiguity in the contract on this question. This court, in its former opinion, said that if, at any time within the period of four years, the Walnart Company or plaintiff repaid Continental from the receipts of the business the sum claimed to be due, then the contract would terminate.

In support of the defendants' proposition that the May 4th contract did not create a trust, counsel for defendants rely upon four propositions, namely: (a) the intention of the parties is to be gathered from the entire instrument; (b) equity will not construe a trust when a discretion to act or not to act is given; (c) even if there was a trust, the subject of it was plaintiff's stock and not the Walnart properties, and (d) an implied trust must be established by clear and convincing proof. Plaintiff points out that propositions (a) and (b) may be answered by the fact that if there was given any discretion to act or not to act, or if there was any intention that is not clearly expressed in the instrument, such a discretion was exercised and such intention clearly made manifest

when immediately after its execution the defendants accepted the trust and went into possession of the properties; that proposition (c) has not heretofore been presented in the pleadings, or in any objection or exception, that plaintiff does not know what it means as it has not been argued, but that apparently defendants are here contending that defendants could do anything they wished with the business and properties because they were trustees only of plaintiff's stock. It is further urged that defendants held the legal title to plaintiff's stock as trustees, and that by such fact and by entering into the possession and control of the business and properties and by the express terms of the contract they became trustees of the business and properties, as held by this court in its former opinion. As to proposition (d), it is plaintiff's contention that the May 4th contract by its terms provided for the pledging of his stock to secure a debt and that it gave, as additional security, the right to enter into possession and control of the business and properties for the purpose of repaying the defendants from the operations. It appears that Wright had won plaintiff's trust and confidence prior to the execution of the May 4th contract; that plaintiff consulted and advised with Wright prior to that date regarding the purchase of his property, the purchases of supplies, etc.; and it is urged that his belief in Wright's sincerity and honesty influenced him in signing the contract without consulting other counsel, and that this trust and confidence led him to believe all that Wright told him. It is urged that this trust and confidence was operating when the changes were made in September 1926, and when plaintiff wrote to Wright on September 25, 1926: "I explained to Mr. Du Hadway in assigning Walnart to Continental that I did not know of anyone except yourself in whom I would have sufficient confidence and in whose integrity I could not be mistaken and that is why I would assign

Walnart without any definite agreements pertaining to my and Walnart's future.''

The questions involved in this appeal, therefore, depend upon the object and purposes of this May 4th contract. It would appear from the pleadings as well as the evidence that the contract was a pledge of the plaintiff's stock to secure a debt, giving the defendants as additional security the right to enter into possession and control of the business and properties for the purpose of repaying the debt from the operations.

Defendants' next point is that in the court below plaintiff's counsel contended and the master upheld the contention that the opinion of this court upon the former appeal, holding that defendants were trustees under the May 4th contract was *res adjudicata* upon that question, but that said opinion was not *res adjudicata* because the case on the first appeal was not decided on its merits; that the case now before the court is essentially different from the case on the first appeal; and that the order reversing and remanding the case was not a final order. However, as contended by plaintiff, it seems that the amended complaint nowhere alleges that the former opinion was *res adjudicata* nor even mentions that opinion, and that no such contention was at any time made to the master or the court below. It appears that the master made no such finding, no objection or exception was filed to any such finding, and no error is cited in defendant's brief upon that question. No reference is given to any place in the record or the master's report where such a contention or finding was made. On the other hand, it appears that both the master and the court state their own independent opinions to the effect that the May 4th contract created a trust.

In arguing that the case now before the court is not essentially different from the one on the first appeal, plaintiff points out that the amended complaint makes

only three changes in the original complaint, none of which affects in the slightest degree the question whether the May 4th contract created a trust. These changes were, first, an admission that plaintiff executed, as president of Walnart, the September 30 and October 1 lease and assignment. In his letter of September 29 Wright had sent to plaintiff, for his signature, copies of the lease and assignment and the last page of the minutes of the directors' meeting of September 27. Plaintiff had never signed those documents but had them in his possession, and these he attached to the original complaint as exhibits. He alleged that attorneys for defendant had advised him that the originals were signed by him, but, though requested, they refused to exhibit the documents. Wherefore, plaintiff said that such documents, if signed, were forgeries or that his signature had been obtained either surreptitiously or by covin or fraud, and misrepresentation as to the true nature of the documents. When plaintiff filed his amended bill, he accepted the statement of defendants' counsel that he had signed a copy of each and he amended his bill so as to state the truth, if such statement was the truth. The second change was the elimination from the original complaint of any charges of fraud and conspiracy. The third change was the omission of the allegation that the May 4th contract constituted a chattel mortgage. When we consider all the facts presented in this record, it would still appear that the conclusion is justified that the May 4th contract created a trust relationship.

Plaintiff's next contention as applied to the facts of this case is that it is the duty of trustees to administer the trust solely in the interest of the *cestui que trust,* and that they can make no profit from the trust for themselves and, secondly, that in all transactions between the trustee and the *cestui que trust* it is the duty of the trustee to advise the *cestui que trust* of his legal

rights and of all the facts and circumstances of the case, and the burden of proving the absolute fairness of the trustee's transactions and that there is no fraud, concealment, or inadequacy of price or inequality of any bargain, and no advantage taken by the trustee of any information acquired by him as trustee, is upon the trustee who seeks to justify the transaction. Plaintiff cites a number of cases in support of the above statement of law, among which is *Commercial Merchants Nat. Bank & Trust Co. v. Kloth,* 360 Ill. 294, where the court said:

"Where one voluntarily assumes the confidential relation towards another, he will not be permitted, at the expense of such relation, to deal in the property of the opposite party for his own pecuniary profit. . . . The burden is on the fiduciary to show the fairness of any transaction between him and the grantor, the mental capacity of the grantor, and that the transaction was just and equitable. . . . Before a court of equity will permit a transaction between parties occupying a fiduciary relation to stand, the dominant party who has profited thereby must overcome the presumption of fraud by clear and convincing proof that he has exercised good faith and has not betrayed the confidence reposed in him."

And in the case of *Meinhard v. Salmon,* 249 N. Y. 458, Mr. Justice CARDOZO used the following language:

"A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'Disintegrating erosion' of particular exceptions. *Wendt v. Fischer,* 243 N. Y. 439, 444, 154 N. E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that

trodden by the crowd. It will not consciously be lowered by any judgment of this court.''

And in *Dixmoor Golf Club, Inc. v. Evans,* 325 Ill. 612, the court said:

''The law is well settled that a trustee cannot without a breach of the trust deal with its subject matter in such a manner as to make a profit for his own benefit. It requires no very keen moral perception to recognize the obvious justice of this universal rule of law, of justice and of morality.''

The defendants suggest that the master found that, as a matter of law, the May 4, 1925 agreement created a fiduciary relationship and that defendants held the stock of plaintiff and the properties of Walnart as trustees. It is stated that the conclusions of the master and the decree appealed from are based solely on the trust theory, and urged that the decree is erroneous if an incorrect conclusion was reached respecting the effect of the May 4th transactions. The contract, defendants urge, is not in form a trust agreement and therefore it is necessary to look beyond the agreement itself to determine whether it is different in legal effect from what it purports to be and that, for this reason, the circumstances surrounding the contract's execution require that they be summarized in some detail. Then defendants go on to suggest some of the facts involved. But, as we understand the objects and purposes of the May 4th contract, the contract was for the security of repayment of a debt to defendant, turning over the stock of the Walnart Company owned by plaintiff as well as the properties of the Walnart Company to be used for the purpose of paying the debt, and subject to plaintiff's right to the return of the stock upon repayment of the debt.

Plaintiff calls this court's attention to the fact that when counsel say that the contract expressly gave the power to defendants to sell, liquidate or take over the properties, they are referring to the purpose clause

in the preamble and not to anything in the contract proper; that the language to which they refer is not anywhere repeated in the contract; and that it is the well settled law that a preamble or purpose clause to a contract forms no part of the contract proper unless repeated or expressly referred to therein in such a way as to make it a part of the contract, or unless it is necessary to refer to such purpose clause for the purpose of explaining an ambiguity in the contract. No ambiguity is pointed out or claimed to exist, and it is to be noted that this contract was drawn by defendants' counsel. In the case of *Wilson v. Towers*, 55 F. (2d) 199, the court said:

"The rule has been long established that 'if the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part is clear, but they are inconsistent with each other, the operative part is to be preferred.'"

Again, in *Chicago Daily News v. Kohler*, 360 Ill. 351, our Supreme Court said:

"The operative part of the agreement is clear and free from ambiguity. Mere recitals, whether they are found in a preamble or at the end of a contract, are distinguishable from obligations or promises. The contract itself is one of bargain and sale, and its clearly expressed stipulations cannot be controlled by but must prevail over the recitals."

It is urged by plaintiff as a fact that under no possible definition of the terms can the lease or agreement be construed either as a sale by Walnart to Continental or as a liquidation of Walnart. A sale contemplates a free offer and acceptance, a seller and purchaser dealing at arm's length, and the fixing and payment of a purchase price. On the question, the master says that Wright and Bonham, as directors of

Walnart, treated plaintiff as an employee and instructed him as to his duties; that they dictated the plan that resulted in the lease and bill of sale (it will be remembered that no one at that time called the agreement a bill of sale), and that they took over all of the assets and business of Walnart with the exception of the building, machinery and equipment, at their own price and in their own way. Upon consideration of the transactions, we are of the opinion that there was neither a sale nor a liquidation, and that the transaction by which defendants took over the business and properties cannot stand.

From an examination of defendants' brief, their third point is predicated on the theory that the lease and agreement constituted a sale of trust property by a trustee and that such a sale was not void but merely voidable. Plaintiff contends that under this point defendants make a number of misleading and incorrect statements. Defendants say that Walnart's debt to Continental had increased between May 4, 1925 and September 1926 to the extent of $61,225.35. Plaintiff calls attention to this statement and says that there was no such evidence and that such was not the fact, and points out other statements of defendants' counsel which he contends are misleading and inaccurate. The facts appearing in the master's report are approved by this court.

Defendants argue that the mere fact that a fiduciary relationship exists does not invalidate transactions between the parties, but when we come to consider the question, there is nothing in the record which militates against the conclusion reached by the master in his report recommending an accounting under the terms fixed by the report as well as the decree.

Upon the question of whether there was a ratification, confirmation or acquiescence by plaintiff in any of the acts of the defendant trustees, such as constitute an estoppel against a recovery in this action, the

defendants argue that plaintiff had knowledge of everything that the trustees did in the operation of this business—the purchase of material, the prices paid for it, profits that the trustees made, the execution of the lease and assignment, the change in the operation on October 1, 1926, and all other things herein complained of—and that he thereby ratified and acquiesced in those acts and is now estopped from complaining of them. Plaintiff, however, contends that there is no evidence anywhere that plaintiff acquiesced, expressly or otherwise, in any of those matters; and further, that the law on the subject of ratification and acquiescence is clear; that like laches, they are a form of equitable estoppel and are governed by the rules that apply to estoppel. (Bogert on Trusts and Trustees, pages 941, 943.) And in support of plaintiff's position, *In re Ungrich,* 190 N. Y. S. 187, is cited.

Plaintiff's final point is that the decree requiring the trustees to account for profits wrongfully made by them from the possession and operation of the trust properties, together with the findings of the master that they should do so, is supported by the pleadings and proofs. Defendants contend that the master's finding that Continental sold $400,000 of material to Walnart, was not based upon any allegation in the pleadings and was not supported by the evidence, but it is pointed out by plaintiff that the evidence from which the master made this finding is as follows: Sales by Walnart from May 1, 1925 to December 31, 1925, $419,254.65; sales by Walnart from January 1, 1926 to October 1, 1926, $193,014.95; total $612,269.60. The mark-up in price of finished products above cost was 5 per cent on fabricated bakelite, and 20 per cent to 25 per cent on radio and fabricated parts; that after September 1926, there was a higher mark-up, possibly 35 per cent; and that the master in his report adopts the percentage most favorable to defend-

ants of 25 per cent. That if $612,269.60 equalled 122½ per cent of cost, which omits all products sold at a lower mark-up, the cost of those materials to Walnart would be $499,812. That over 80 per cent of all those materials was purchased from Continental, and that over 80 per cent of $499,820 is over $399,850. The master says $400,000. Plaintiff carries these computations further to show that Continental's selling price to Walnart was 40 per cent above its cost of production; that there would, of course, be no cost of sales in selling to themselves. That they operated Walnart exactly as they would a branch factory. That a 40 per cent mark-up by Continental above its cost of production represents a profit of 28.57 per cent of its selling price, or $114,238.85, so that by October 1, 1926 the trustees had made a profit on materials purchased from themselves of $28,000 over and above the $86,000 owing them by Walnart. And that thus, prior to September 26, the indebtedness was fully paid and it then became the trustees' duty to return plaintiff's stock and the Walnart business and properties to its stockholders. Plaintiff cites, in support of his contentions, the case of *Magruder v. Drury*, 235 U. S. 106.

When we come to consider all the evidence and the suggestions made in support of and against the master's report, we agree with the suggestions offered by plaintiff on the question of an accounting, that the decree be affirmed.

One of the defenses interposed was that of laches, but on this question the master found that the record was clear, that plaintiff reposed confidence and trust in Wright and that it was not until 1932 when he left the Cleveland office of Continental and had conversations with Dushek, the bookkeeper and accountant for Walnart and later for Continental, that he learned of the large profits made subsequent to October 1, 1926 and questioned the representations made to him by de-

402

fendants; that during the entire period following October 1, 1926 he was in the employ of the defendants and presumably still had faith and confidence in the truth of the representations made to him by them. Upon considering these facts, we find they do not support defendants' defense of laches. It is a familiar rule that laches is an affirmative and an equitable defense, and under the circumstances we are of the opinion that there was no error in this regard.

The question remaining to be disposed of is the matter of plaintiff's cross-appeal. In support thereof, plaintiff contends that the trustees are accountable for all profits made out of the trust property, and that where they wrongfully take and retain trust property for their own use, they are liable for compensation for such use and are entitled to retain no profits made therefrom. Plaintiff's further suggestions are that the court below and the master have construed the May 4, 1925 contract as creating a trusteeship; that the Continental Fibre Company and the defendants took over the Walnart Company and its properties and operated them as trustees under that contract; that the master has held that because of that fiduciary relationship such trustees were not entitled to retain for themselves the profits made by the company or profits made by themselves from their control and operation of the company. The master reached the conclusion that the taking of the properties by defendants was wrongful and that the properties had been wrongfully withheld from plaintiff by defendants, and that therefore they must account and pay for the use of the business, building, machinery and equipment, whether or not they made any profits therefrom. It would appear that this conclusion was in accordance with the law, and that up to that point the master's finding is clear.

It is plaintiff's contention that the court, by its decree intended to provide, as found by the master,

that the defendants were trustees under the May 4th contract and as such were not entitled to make or retain for themselves any profits from the trust; that when on October 1, 1926 they wrongfully took over the property as their own, destroyed Walnart as a company, its business and good will, while at the same time swearing that they did not intend to conduct any such business in Illinois and telling plaintiff that they were merely changing the method of operating the plant, that the May 4th contract was still in full force and effect, that the affairs of the company were being held intact as a going concern subject to his right to take back the whole company at any time upon payment of the amount mentioned in the contract and that if any profits accrued they would be held as a part of the assets, there then should be applied a different measure of accounting from that applicable to the period prior to October 1, 1926; that the trustees should then be held accountable, not merely for profits made by them, but for the business and all of the other assets and properties wrongfully taken by them and for the value of their use.

However, upon consideration of this cross-appeal, we find that plaintiff is asking that the decree be affirmed, and, further, that, in affirming it, this court hold that from and after October 1, 1926, the trustees shall be entitled to no profits made by them from the use of the assets and properties, business, building, machinery and equipment of Walnart Company, and that, if on such accounting the court shall find that the trustees made profits in excess of the reasonable value of the use of such assets and properties, then the true measure of the value of the use thereof shall be the profits so made. This court is asked to affirm the decree but change the method of accounting. In our opinion, to do so, we would be obliged to change the theory of and modify the decree. We cannot grant the relief plaintiff seeks unless we reverse the decree.

No part of the decree entered in the instant case was adverse to the plaintiff and, hence, plaintiff was not in a position to file a notice of or prosecute a cross-appeal. In such cases, he does have the right to sustain the judgment or decree upon any ground warranted by the record irrespective of whether the particular reasons given by the trial judge or his specific findings are correct.

Having reached the conclusion as we have upon the merits of the appeal, we are of the opinion plaintiff is not entitled to question the decree without practically recognizing that the decree is erroneous. Having asked that the decree be affirmed, we would not be justified in following plaintiff's contentions on the question of modifying the method of accounting. For the reasons stated, the cross-appeal of plaintiff is denied, and the decree affirmed.

*Decree affirmed.*

KILEY, J., concurs.

MR. PRESIDING JUSTICE BURKE dissenting: The instrument did not create a trust, nor did the facts and circumstances attendant upon its execution raise an implied trust. The effect of plaintiff's contention as to the obligation assumed by defendants would be that during the four years following May 4, 1925, Continental was under a duty to operate and manage the Walnart properties with no compensation to itself and with only the knowledge that if it were successful in its operation it would ·recover the $86,000 debt which Walnart owed. Beyond that, under plaintiff's theory, Continental was entitled to nothing. According to plaintiff's theory, Continental assumed the obligation of carrying on a business in Chicago, undertaking to pay its financial obligations, undertaking to endeavor to put the company on a sound financial basis through advances and through loans secured from bankers; and it would have made no difference if

Walnart had continued in financial difficulties throughout the four-year period; it would have made no difference if Walnart lost large sums of money and proved itself unable to operate at a profit; it would have made no difference if Continental had been required to pour hundreds of thousands of dollars into Walnart in order to maintain its operations; and none of these things would have made a difference because Continental had obligated itself by the May 4th contract to keep the business running for plaintiff's benefit, and, if at the end of four years plaintiff was not able or did not wish to pay Continental the amount of Walnart's debt, then plaintiff would have said, ''I don't wish to redeem my stock, you may have the company.'' It cannot be doubted that if at any time after the May 4th contract was made, defendants acted under the terms of the contract and threatened to sell, liquidate or dispose of the business of Walnart, and plaintiff had commenced a suit to enjoin such threatened disposition on the ground he now urges, namely,—that the Walnart business was trust property and could not be sold until after the expiration of four years—that such suit could not have been successfully maintained. The law is well settled that where a trust is sought to be established, every word used in the instrument wherever found must, if possible, be given weight in determining the effect of the instrument. *Bear v. Millikin Trust Co.,* 336 Ill. 366; *Ellis v. Flannigan,* 279 Ill. 93, 97. In my opinion the words used in the contract do not show an intention expressed or implied to create a trust in the Walnart properties. In arriving at the intention, the court should look to the preamble as well as to the operative part of the contract. The preamble expressly negatives an intention that the Walnart business and properties be held in trust for any definite period of time.

I agree with the contention of the defendants that even if the May 4th instrument created a trust in the

Walnart business and properties, plaintiff by his own voluntary acts agreed to a disposition of the properties which he contended constituted the *res* of the trust. Plaintiff, in support of his theory, testified in detail to the alleged conversations had with defendants' representatives as to developments in Walnart's affairs after May 4, 1925. This testimony was given about 14 years after the conversations allegedly took place. The testimony given by plaintiff as to these conversations is uncorroborated. In my opinion, the letters admittedly passing beween the parties and other documentary evidence tell the true story. Plaintiff contends that for six years after the bill of sale was executed (September 30, 1926) he believed that Walnart was being operated for his benefit and that Walnart was entitled to the profits of operation. The letters and other documents in the record, written by the parties at the time the transactions took place and before any controversy had arisen, disprove plaintiff's contention and show clearly that the defendants acted honorably and fairly in all their transactions with the plaintiff. I am convinced that the plaintiff was fully aware of what was transpiring and that he acted with full knowledge of his rights. Walnart was hopelessly involved financially. Plaintiff was willing to have Continental take over the business. Shortly after the October 1926 documents were executed, the name "Walnart" was taken from the Walnart building, from the delivery trucks and the telephone directory, and the lock on the door of the premises was changed. Billings and correspondence thereafter appeared on the letterheads of Continental, Walnart being designated as the Chicago factory of Continental. Everything that was done in and about the premises and business of Walnart showed the change of ownership from Walnart to Continental. On January 8, 1927 plaintiff wrote Wright acknowledging receipt of a notice of a directors' meeting of Walnart to be held on

January 11, 1927. In this letter plaintiff said he had been reviewing recent events pertaining to Walnart, having in mind some future date when he would again operate that plant; that plaintiff objects' to defendants' charging Walnart interest on the Walnart notes, saying that this seemed entirely contrary to the understanding to the effect that in consideration of the dollar per year lease, all expenses, including interest, should be borne by Continental. This letter continued: ''Now in this manner, you having assumed all of Walnart's assets and means of income, are further adding interest charges on money being used for your benefit without providing an income to offset that expense.'' This letter clearly recognizes that Continental was rightfully operating the business in its own behalf and urged that because such was the case, interest should not be charged to Walnart.

Walnart's real estate, machinery and equipment, having been excluded from the bill of sale, delivered in 1926, was thereafter and until May 1929 owned by Walnart. In September 1926 the premises and the plant of Walnart were leased to Continental. It was agreed that Walnart close its business, that all the business, good will, patents and patent rights of Walnart be assigned to Continental in further consideration of the payment during the period of the lease by Continental of current taxes, premiums on fire insurance policies, interest on two mortgages on the property, and in further consideration of Continental not bringing suit against Walnart for collection of its claims, based on all or any part of the indebtedness due by Walnart. The originals of the bill of sale and the lease were signed by plaintiff as president of Walnart between September 22, 1926 and September 30, 1926. On January 9, 1929 Wright wrote to plaintiff calling his attention to the fact that the contract of May 4, 1925 would expire in a few months and asked plaintiff if he desired to repossess himself

of his stock covered by the May 4th contract. Plaintiff replied to this letter on January 14, 1929. On January 28, 1929 Wright replied to plaintiff's January 14th letter, enclosing an extract from Continental's books showing the amount owing Continental by Walnart to be $216,687.60, and stating that if Walnart did not liquidate this indebtedness by the expiration date of the contract, Continental would take formal possession of the property. This aggregate sum of $216,687.60 is made up of various debts of Walnart theretofore paid by Continental, and all debts owing to Continental from Walnart, less certain credits given Walnart. It was admitted in the complaint that these debts were properly chargeable to Walnart. On February 9, 1929 plaintiff replied to Wright's letter of January 28, 1929, saying that he examined the statement showing the debt due from Walnart to Continental as $216,687.60, and that this amount was approximately correct. In that letter he also asserted that when he stated that the amount was approximately correct he questioned Wright's justification for charging interest amounting to about $24,000 "because during that period the property was operated by and for the benefit of yourself and under the lease contract there was no income to offset this interest charge." In the letter he also called attention to the indebtedness statement and said that omitted from the statement were current liabilities amounting to $61,222.25, which properly should be credited to Continental. While in his letters, plaintiff insisted that interest was not chargeable to Walnart, in his pleadings in this case plaintiff does not allege that the items of interest were improperly charged to Walnart. On May 10, 1929, at a meeting of the stockholders of Walnart, a resolution was passed reciting that Walnart was indebted to Continental in the sum of $216,687.60; that Walnart had for several years past ceased to do business, but retained the title to the

Green street premises in Chicago. At this meeting it was resolved that the officers of Walnart were authorized to convey by warranty deed to Continental the Green street premises, machinery, etc., and to have the value of the real estate applied toward the repayment of the indebtedness of Walnart to Continental, the latter then being the only creditor. The minutes of this meeting were read and approved in writing by plaintiff. On May 14, 1929 a deed was executed by Walnart conveying the Green street real estate to Continental. On April 24, 1940 plaintiff signed and sent to Wright a proxy for a meeting of the stockholders of Walnart, the meeting to be called for the purpose of passing a resolution dissolving the Walnart corporation. A certificate of dissolution of Walnart was filed with the Secretary of State of Illinois on June 25, 1930. Plaintiff's contract of employment was terminated on May 1, 1932. In August 1932 a controversy arose with respect to plaintiff's employment contract with Continental. On November 29, 1932 plaintiff filed his complaint in the instant case. Shortly before the complaint in the case at bar was filed, plaintiff brought suit against Continental in the United States district court, claiming damages arising out of an illegal termination of plaintiff's employment contract. This suit resulted in a verdict and judgment for defendant Continental. Judge JOHN BARNES, who presided at the time, entered a finding of fact that the employment contract was rightfully terminated by Continental. Upon plaintiff's appeal to the United States circuit court of appeals the judgment of the district court was affirmed. A careful reading of the record establishes that plaintiff was possessed of full knowledge of all details of the business of Walnart between May 4, 1925 and October 1, 1926; that in fact he was in full control of the operation of Walnart during that period, except for the handling of credits. Being in pos-

session of all the material facts he agreed to every transaction of which he later complained. The master found that during that period plaintiff "was in full knowledge of the details of the Walnart business and activities." I agree with the contention of defendants that the master's ultimate finding that Continental sold $400,000 in materials to Walnart between May 4, 1925 and October 1, 1926, upon which defendants made a profit, was not based on any allegations in the pleadings; was not supported by the evidence in the record; and that the proof shows that plaintiff acquiesced in sales made by Continental, receiving the benefit of same, and was therefore estopped from obtaining any advantage growing out of such sales. Plaintiff knew that Walnart could get materials from no other source and that if Continental refused to sell materials to Walnart, it would, of necessity, have immediately been forced to cease operations.

I agree with the contention of defendants that the master's reports, which the decree affirmed, do not conform either to the theory of the complaint or to the proof. The master found that the September and October 1926 conveyances constituted a valid sale as far as profits after October 1, 1926 were concerned, but nevertheless found it was not a valid sale as far as the tangible assets described in the bill of sale were concerned. The finding that plaintiff was entitled to relief was not based on any allegation appearing in the complaint and was made despite the sole theory of the complaint that Walnart was entitled to profits after October 1, 1926. It will not be disputed that the bar of laches begins to run from the time that the facts complained of would have been discovered by the exercise of reasonable diligence. Plaintiff alleged that he did not know until 1932 that the Walnart debt to Continental had been paid prior to December 31, 1927, "out of the operation and net profits." However, the record shows that as early as 1927, when

plaintiff was working for Continental in Chicago, he had figures before him showing that large profits were being made out of the operation of the Walnart premises. Plaintiff admitted that he conferred with his attorney in 1930, two years before the instant suit was filed, with reference to the Walnart dealings, and showed him the letters and documents pertaining to these transactions. I am of the opinion that the decree should be reversed and the cause remanded with directions to dismiss the complaint for want of equity.