SIMON, Justice.
The importance and the exigencies of this case require our rendering a prompt decision, and being of the opinion that Act 170 of the Legislature of 1952 is unconstitutional in that it violates the provisions of Section 3, Article 14 of the Louisiana Constitution of 1921, LSA, and is therefore null, void, and without effect, as will be hereafter more fully shown by written reasons to be assigned on our next decision day;
It Is Ordered, Adjudged and Decreed that the writs heretofore issued be made peremptory and that the judgment of the district court be reversed, annulled and set aside; and
It fs Now Ordered, Adjudged and Decreed that Act 170 of 1952 be declared unconstitutional, null and void in its entirety, and that Jules G. Moliere, Beauregard H. Miller, Jr., John G. Fitzgerald, Anthony A. Caramonta and Alwynn Cronvich be permanently enjoined and restrained from assuming office as members of the Commission Council of the parish of Jefferson and from performing or attempting to perform or to exercise any of the functions, duties, powers, rights and privileges of said offices as provided by said Act.
It Is Further Ordered, Adjudged and Decreed that the sheriff and ex-officio tax collector in and for the parish of Jefferson be permanently enjoined and restrained from distributing taxes collected by him to the Commission Council of Jefferson parish, as provided by said Act 170 of 1952.
All costs of these proceedings to be paid by defendants Jules G. Moliere, Beauregard H. Miller, Jr., John G. Fitzgerald, Anthony A. Caramonta and Alwynn Cronvich.
HAMITER and McCALEB, JJ., dissent.
FOURNET, C. J., PONDER and HAWTHORNE, JJ., and VIOSCA, Justice ad hoc, concur.
SIMON, Justice.
*789 By proceeding instituted in the Twenty-fourth Judicial District Court for the parish of Jefferson, four police jurors of said parish suing as such and as residents, taxpayers and electors, seek to enjoin the Commission Councilmen-elect of said parish, elected pursuant to said Act, from assuming said offices and from exercising any powers or functions thereof; to enjoin the Police Jury of the parish of Jefferson and its members thereof from vacating their offices, and to enjoin the sheriff and ex officio tax collector of the parish from distributing tax funds collected by him to the Commission Council, all on the ground that Act 170 of 1952 is unconstitutional.
Relators assail the constitutionality of Act 170 of the Legislature of 1952 on several enumerated constitutional grounds; however, the primary contention is that the said Act violates Section 3 of Article 14 of the Louisiana Constitution of 1921.
A temporary restraining order, enjoining all of the aforesaid acts was granted and a rule nisi issued ordering all of the defendants to show cause why injunctive relief as prayed should not he granted.
Exceptions of prematurity, of no right or cause of action and pleas of estoppel were filed by one or more of the respondents, all of which exceptions and pleas were referred to the merits. Respondents then filed answers and in effect generally denied the alleged unconstitutionality of the Act and reurged the plea of estoppel.
By stipulation of counsel, trial was had on said rule and on the merits of the controversy ; and judgment was rendered vacating the temporary restraining order, denying the application for a preliminary writ of injunction and dismissing the rule. The record does not disclose a formal judgment dismissing the suit.
From said judgment relators applied for and we granted writs of certiorari, prohibition and mandamus and reinstated the temporary restraining order pending ascertainment of the validity of the proceedings had below.
Act 170 of 1952 purports, among other things, to abolish the Police Jury system of government of Jefferson parish and to substitute therefor a Commission Council composed of five members, one of whom is elected at large and the other four from districts established by the Act. This Act was submitted to and approved by a majority of the electors of the parish of Jefferson at a special referendum election held in connection with the general election of November 4, 1952.
At the general state election had on April 17, 1956, pursuant to and under authority of Act 170 of 1952, the electors of the parish of Jefferson elected Jules G. Moliere as commissioner-at-large, and Beauregard H. Miller, Jr., Anthony A. Caramonta, John G. Fitzgerald and Alwynn Cronyich from their respective districts as *791 members of the Commission Council of said parish.
Thus, the issue presented to us is whether Act 170 -of the Regular Session of the Louisiana Legislature of 1952 is constitutional, the resolution of which will determine whether relators are entitled to the injunctive relief sought in this instance.
Section 3 of Article 14 of the Louisiana Constitution of 1921 reads as follows:
“The Legislature shall provide optional plans for the organization of parochial government, and any parish may change from one plan, so prescribed, to another, when;authorized by a majority of the electors voting at an election held for .such purpose.”
Respondents argue that-Act 170 of 1952 was enacted pursuant to and under the authority of the cited constitutional provision. On the other hand, relators argue that the cited constitutional provision does not authorize the enactment of a special form or plan of parochial government for any one particular parish, but rather it is a mandate to the Legislature to provide by general law one or more optional plans of parochial government which, shall be available to any and all parishes of the state.
In 'tracing the word “parishes” to its •‘origin, and; in considering this constitutional provision in the light of its history,[1] we find that the word “parish” was used in France to denote ecclesiastical divisions of the territory — “the spiritual, and, in some particulars, temporal, division”. The original colonists of Louisiana accepted and became accustomed to similar divisions of territory. In the course of time the word “parish” was used to indicate political divisions of the state. From the earliest days there were parishes in the territory — -“parishes” at first, and afterwards “parroquia” under Spanish rule. When the state was admitted into the Union on April 8, 1812, the French name was retained to indicate the civil or political territorial division recognized by law. Being civil divisions of the state, corresponding to counties in other states, and regarded as quasi corporations deriving such powers as they possessed not from special and voluntary charters but under our general laws, they existed merely as involuntary agencies of the state to exercise certain functions of local government and to perform such duties as may be imposed upon them by the sovereign. The chief distinction between parishes and municipalities is that the former are clothed with such governmental powers as they possess primarily and directly by the Legislature and without the consent of the citizens or inhabitants immediately affected; whereas the charters *793 of municipal corporations are granted at the^ instance of the people who compose them.'
The origin of the important organization styled “Police Jury”, now the prevailing governing body of the various Louisiana parishes, other than the parishes of Orleans and of East Baton Rouge, is found in an Act of the legislative council and House of Representatives of the territory of Orleans, of April 6, 1807. On April 30, 1811, prior to the constitutional convention of November, 1811, an Act was adopted designating, for the first time, the governing body, of parishes by the term “Police Jury”,, and establishing it as a distinct elective body.
Since 1811 the Police Jury system has been a time-honored and well-established institution of parochial government, and since 1879 to date every Louisiana Constitution has recognized the Police Jury as the principal parochial authority of the parishes, granting it special powers and giving it directives. Const. 1879, Art. 163;. Const. 1898, Arts. 58, 128, 174, 223, 276, .291, 293; Const. 1913, Arts. 58, 118(4), 125, 128, 174, 223, 255, 276, 281(2), 281(4), .292, 293; Const. 1921, Art. IV, § 12, Art. VII, §§ 46, 50, 52, 62, Art. IX, § 8, Art. .XIV, §§ 14(c), 14(d), 14(d-l), 14(d-2), .14(d-4), 14(e), 14(k-l-a), 14(q), 14(s).
In conformity with the movement of the ■times and in an effort to modernize local government and due to urban development and growth in population, the Legislature of 1914 enacted Act 190, which provided in detail an alternative commission form of government, styled the “Parish Commission Plan”, making it available to- all of the parishes throughout the state and leaving it optional with the inhabitants of each parish to adopt the new alternate form by a majority vote of the electors, thereby ■ suggesting for the first time a change in ■ the time-honored existing parochial government by police juries.
It is highly significant that the Act of 1914 is a general law applicable to • and making available to all parishes an alternate parochial system of government from the existing Police Jury system and not one directed to any specified parish exclusive of other parishes in-the state. It has never been repealed, nor- has its constitutionality been questioned. .On the contrary, it was incorporated in our LSA-Revised Statutes of 1950 [2] and is now the prevailing law providing for an alternate form of parochial government, and is considered to be a compliance with the mandate contained in the herein cited constitutional provision.
It is obvious from the proceedings of the constitutional convention of 1921 that there was a divergence of opinion among the delegates as to whether one or more forms of parochial government should be afforded the parishes. Some of the dele *795 gates were in favor of maintaining the historic Police Jury system and confirming it by specific constitutional provision. Others advocated its abolition and the substitution therefor of a more streamlined form of government. They suggested a plan of management of all parish affairs, with the exception of Orleans, by a board of supervisors composed of five freeholders. Another plan proposed that the affairs of all the parishes, Orleans excepted, should be' administered by a commission of five electors selected at large. Another plan proposed that the affairs of the parishes, Orleans excepted, be managed by and under the control of a Police Jury, composed of not less than five and not more than seven freeholders.[3]
It is most significant that all of the proposals for parochial government were directed and were to be made ’available to all parishes within the state, the parish of ■Orleans excepted, and no proposal was suggested authorizing the Legislature to enact a specific plan for the government of any single parish.
Thus we see the early desire and recognition of the need of optional plans of parochial government, and for which reasons we are convinced that the concept of local option in parochial government was finally adopted in the concise form of Section 3 of Article 14 of the Constitution of 1921, LSA, and thus unmistakably showing that the constitutional convention intended to fully cover the subject of parochial government to be made available to all parishes.
It is obvious that this section of the Constitution provides the exclusive remedy for changes in the form of parochial government throughout the state, permitting some degree of local option but maintaining a measure of uniformity in local government.
Section 3 of Article 14 of the Constitution by its very caption, carried in heavy black type, calls for “Optional plans, of parochial government”, clearly denoting its singular purpose, to provide optional plans for the organization of parochial government in the state. It imposes a mandate upon the Legislature to provide one or more complete plans of optional government which would be available to any and every parish of the state. The language of' this section clearly does not authorize the-Legislature to enact a special, tailor-made-plan of government for any one particular-parish. What is clearly prescribed in this, constitutional section is that any parish may change from one plan so prescribed, to- *797 another, which unquestionably means any optional plans prescribed by the Legislature and made available to all parishes.
If the framers of our Constitution intended that the Legislature should enjoy unlimited freedom to act in the matter of parochial government by adopting special ■statutes affecting any one particular parish to the exclusion of all others, then there •would have been no necessity for the adoption of Section 3 of Article 14. It is manifest that the constitutional framers meant to and did provide in this section the exclusive remedy for changes in the forms of parochial government and directed the Legislature to prescribe optional plans applicable and .made available to any one or more parishes, subject, however, to the .approval of a “majority of the electors voting at an election held for such purpose”. It is crystal clear that this constitutional .•section specifically limited and therefore prohibited the Legislature from imposing .any new plan of government on any one •parish, as was done in the instant case by Act 170 of 1952.
It is an elementary principal of law in the interpretation and construction of ■constitutional and statutory provisions that ■where the means for the exercise of the ;granted power are expressly given and the mode of its exercise is described, such a mode is exclusive of all others. Cooley in his Treatise on Constitutional Limitations, 8th Ed., Vol. 1, p. 176, note 4, states that,
“ * * * every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame-of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, creates implied limitations upon the lawmaking authority as strong as though a negative was expressed in each instance.”
We necessarily conclude that Act 170 of 1952 was enacted in disregard of the limitations imposed on the Legislature by Section 3 of Article 14 of the Constitution of 1921, LSA, said Act purporting to establish parochial government made applicable only to the parish of Jefferson, to the exclusion of and unavailable to all other parishes in the state. This Act departs from the constitutional scheme embracing the Police Jury system of parochial government and that of optional or alternate plans, as prescribed by existing general law, and made available to any or all parishes, and is therefore clearly unconstitutional.
We find no merit in counsel’s contention that Section 3 of Article 14 of the Constitution does not contain any legislative limitations. In support of this contention they rely on our ruling in Gandolfo v. Louisiana *799 State Racing Commission, 227 La. 45, 78 So. 2d 504, 514, and they quote therefrom the following language:
“We re-affirm our previous rulings that the provision in Article 19, Section 8 of the Constitution of 1921, reading ‘Gambling is a vice and the Legislature shall pass laws to suppress it’, is not self-operative, that there is delegated to the Legislature, and to the Legislature alone, the power to suppress gambling, and to determine how, when, where, and in what respects gambling shall be prohibited or permitted.
The. cited case is easily distinguished from the case at bar. Article 19, § 8 of the Constitution provides in specific and direct language that the Legislature shall pass laws, to suppress gambling, but it does not suggest or intimate the method to be employed in doing so. On the other hand, Section 3 of Article 14, here involved, does not only direct that the Legislature shall provide optional plans for the organization of parochial government, but goes further and directs that these optional plans of parochial government shall be available to all parishes when it states “any parish may change from one plan, so prescribed, to another”. In effect, therefore, a limitation is imposed upon the Legislature, and it is prohibited from adopting any statutes prescribing parochial government which are not available to any or all of tlie parishes in the state, excepting Orleans and East Baton Rouge, the latter having only recently effected a change in its parochial government by virtue of an express constitutional amendment. Const. Art. 14, § 3(a).
Counsel further contend that the constitutionality of Act 170 of 1952 should be upheld for the reason that an overwhelming majority of the electors of Jefferson parish in 1952 approved this proposed form of government and that the Commission Councilmen-elect have been elected to their respective offices by popular vote.
We have answered this contention in the case of Graham v. Jones, 198 La. 507, 3 So.2d 761, 782, saying:
“Mr. Cooley, the most eminent writer on Constitutions and the jurisprudence which makes them effective, has said:
“ ‘The theory of our political system is that the ultimate sovereignty is in the people, from whom springs all legitimate authority. The people of the Union created a national constitution, • and conferred upon it powers of sovereignty over certain subjects, and the people of each State created a State government, to exercise the remaining powers of sovereignty so far as they were disposed to allow them to be exercised at all. By the constitution which they establish, they not only tie up the hands of their official agencies, but their own hands as well; and *801 neither the officers of the State, nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental lavo/ Cooley’s Constitutional Limitations, 8th Edition, Vol. I, p. 81. (Writer’s italics.)”
The above rule has been announced in a number of cases decided by both federal and state courts. Thus, in Duncan v. Mccall, 139 U.S. 449, 11 S.Ct. 573, 576, 577, 35 L.Ed. 219, the Supreme Court of the United States declared that:
“ * * * while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities (Writer’s italics.)
The Supreme Court of Iowa in Koehler v. Hill, 60 Iowa 543, 14 N.W. 738, 741, 15 N.W. 609, in holding that a proposed constitutional amendment improperly submitted was not validated by the favorable vote of the electors, expressed itself in these words:
“It matters not if not only every elector, but every adult person in the state, should desire and vote for an amendment to the constitution, it cannot be recognized as valid unless such vote was had in pursuance of, and in substantial accord with, the requirements of the constitution.”
We are not aware of any jurisprudence or text-writer or constitutional law that questions the soundness of the above mentioned rule. Every well-recognized authority on the subject concedes not only the soundness of, but the absolute necessity for the rule that once the people have agreed on the method to be followed in compliance with their fundamental law, they are powerless to alter the terms of that fundamental law except in the manner provided in the agreement itself or by constitutional amendment.
Respondents by way of exception and in their answers set up a plea of estoppel. The plea is founded on the contention that relators are estopped to bring this action, because as police jurors they were “ * * * active in bringing about the enactment of * * * Act 170 of 1952” and took “all possible steps to see that the Commission Council form of government as set forth in said Act would become effective in the parish of Jefferson”. They further contend that relators are also estopped to institute this suit in their capacity as police jurors because “the Police Jury * * * was advised by its counsel that the Police Jury itself could not and should not bring this action; and, further, the Police Jury voted to follow that advice.” Respondents do not contend that relators should be barred from suing because of having brought this suit as residents, taxpayers and electors.
*803 Conceding, for the sake of argument, that these contentions may find support in our law, we find no merit in the plea.
Having concluded that Act 170 of 1952 was adopted in contravention of the constitutional provision of Section 3, Article 14, the plea of estoppel may not be invoked to validate that which is invalid per se; or, in other words, a plea of estoppel may not be invoked to render constitutional that which is unconstitutional. Furthermore, to allow the invoking of such a plea would make public offices which have been declared to be constitutionally non-existent valid and existing.
We are mindful that when an Act is declared unconstitutional it follows that it imposes no duties, confers no rights, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed thereunder. Such, a statute leaves the question that it purports to settle just as it would be had the statute not been enacted, or as inoperative, as if it had never been adopted.
Ever conscious of the importance of questions as are here presented, which so vitally affect the law of this state and the relationship that exists among the governmental departments of the state and its political subdivisions, we experience great reluctance in being called upon to declare an enactment of the Legislature void because of its conflict with the Constitution. In the determination of such difficult and delicate questions and in the performance by this court of a duty which is inescapable, we are animated solely by the desire to discharge our solemn duty to enforce the Constitution as the paramount law — a law which is as binding on the court as it is on the executive offices, the members of the Legislature and the people themselves.
HAWTHORNE, J., concurs.
McCALEB and HAMITER, JJ., dissent.

. See City of New Orleans v. Board of Supervisors of Elections for Parish of Orleans, 1949, 216 La. 116, 43 So.2d 237, as to the value of the historical approach ' in constitutional interpretation.

. LSA-R.S. 33:1271 et seg.

. Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana Begun and Held in the City of Baton Rouge, March 1, 1921; Ordinance No. 60, p. 52; Ordinance No. 114, pp. 713-714; Ordinance No. 481, pp. 767, 768.