423 So.2d 662 (1982)
Reid J. CANCIENNE, et al.
v.
LAFOURCHE PARISH POLICE JURY, et al.
No. 15043.
Court of Appeal of Louisiana, First Circuit.
October 12, 1982.
Rehearing Denied December 16, 1982.
*663 Jerald P. Block, Thibodaux, for plaintiffs-appellants Reid Cancienne, Quentin D. Falgout, Henry Scavone, Louis J. Scavone, and Guy P. Zeringue.
Jerome J. Barbera, III, Thibodaux, for defendant-appellee Lafourche Parish Police Jury.
Eugene Gouaux, and Ashley Bruce Simpson, Lockport, for defendant-appellant Town of Lockport.
Before LOTTINGER, COLE and CARTER, JJ.
CARTER, Judge.
Plaintiffs, Reid J. Cancienne, Quentin D. Falgout, Henry Scavone, Louis J. Scavone, and Guy P. Zeringue, filed suit against the Lafourche Parish Police Jury and the Town of Lockport seeking a judgment declaring their right to terminate the defendants' use of a road on plaintiffs' land and declaring their right to cause the defendants to remove a pumping station located on part of plaintiffs' property. Plaintiffs appeal from a judgment in favor of the police jury and the Town of Lockport.
*664 Plaintiffs are the owners of a certain tract of land situated in the Parish of Lafourche. Plaintiffs acquired the property from Lakeside Farms, Inc. on August 23, 1978. This tract of land is completely surrounded by water, bounded on the east by the Forty Arpent Canal, on the south by the Tom Foret Canal, and on the west and north by the old Intracoastal Waterway (Company canal). In 1975, the Lafourche Parish Police Jury, in conjunction with the Town of Lockport, constructed a pumping station at the intersection of Tom Foret Canal and Forty Arpent Canal. Since plaintiffs own to the mid-line of the canal, subject to a servitude for public use, the pumping station rests partially on plaintiffs' property. The pumping station located at the intersection of Tom Foret Canal and Forty Arpent Canal is a public facility that is owned by the Lafourche Parish Police Jury and operated by the Town of Lockport. Mr. Emile J. Toups acquired the property in 1943 and continued to own same until he incorporated Lakeside Farms, Inc. in 1966. Lakeside Farms, Inc. was created as a family corporation. The property was conveyed to Lakeside Farms and it was the owner until the sale to the present plaintiffs on August 23, 1978.
Although at some previous time the property had been farmed, at the time that Mr. Toups acquired the property, it was a lake and under water. A ring levee system that had previously existed surrounding the property had been washed in by boat traffic. In 1963, Mr. Toups fixed the levee system, pumped the property dry, and commenced to use the property for cattle grazing and farming operations. In 1972, Mr. Toups entered into an agreement with the Town of Lockport to allow the town to use a portion of the property as a garbage landfill, giving the town the right of access to the then existing drainage pumps on Forty Arpent Canal. Prior to 1972, the Town of Lockport had access to the then pumping station, not through Mr. Toups's property, but through the property of C.M. Comeaux. Apparently, some time in 1975 the location of the pumps was changed to their present location at the intersection of Forty Arpent Canal and Tom Foret Canal.
In 1975, after the pumps had been relocated, Mr. Toups gave the Town of Lockport and the police jury access to the pumps and the right to use the Vacherie Street gate providing they kept it locked so that the general public could not go on the levee at any time. The gate was owned by Mr. Toups and maintained by the Town of Lockport. Mr. Toups further granted permission to the Town of Lockport and the police jury to use the road providing access to the pumping station. Apparently, a portion of this same road was used by the Town of Lockport as access to the garbage dump. Mr. Toups testified that he only gave the police jury and the Town of Lockport permission to go to and from the pumps, to build the pumps, to bring material back there, and to operate the pumps. He readily recognized that the location of the pumps at the intersection of Tom Foret Canal and Forty Arpent Canal was partially on property that he owned (owning half of the Tom Foret Canal). Mr. Toups testified as follows:
"Q. Was it your intention that if you wanted to later on change your mind, to have them remove it, that they would be required to remove those pumps?
A. I don't think I would have ever gotten to that point, to make them remove the pump, because, to a certain extent, the pump was helping us quite a bit in maintaining and lowering the water level in the Forty Arpent Canal, which bounded our levee."
Mr. Toups further characterized the roadway leading from the Vacherie Street gate to the pump site as a dirt road where "the ground was hard enough that you could drive on it." Mr. Toups stressed many times in his testimony that he only gave permission to go to and from the pumps, to construct the pumps and to operate the pumps with the understanding that all parties would pass through the gate on Vacherie Street only and it would be kept under lock and key.
*665 On August 23, 1978, Lakeside Farms, Inc., the wholly-owned family corporation of Emile F. Toups, transferred to the present plaintiffs all of the property constituting Lakeside Farms, Inc., subject to numerous "restrictions and reservations", including the following:
"II. Verbal permission given to the Lafourche Parish Police Jury and to the Town of Lockport for access to the pumping station located on the Tom Foret Canal."
Obviously, sometime thereafter a dispute arose between the present owners and the governing bodies over the use of the land that the pumps were situated on and the use of the access road through the Vacherie Street gate, which resulted in the present suit for declaratory judgment being filed on May 22, 1980 (approximately twenty-one months after plaintiffs acquired the property).
In this suit for declaratory judgment, plaintiffs seek to have declared that they have the right to terminate access to and from the pumping station by the police jury and the Town of Lockport, and further seek to have decreed that they have the right to cause the aforesaid defendants to remove the pumping station from any portion of their property.
The trial court found that plaintiffs' ancestor in title, Lakeside Farms, Inc., had granted verbal permission and acquiesced in the use of the road and in the construction, maintenance and operation of the pumping station on the property in question in 1975, and further found that defendants had used the road for access to the pumping station without objection or opposition from either the plaintiffs or their ancestors in title until the suit was filed on May 22, 1980. Thus, he reasoned that under the facts of this case, there was consent and acquiescence both prior to the decision in Lake[1] and subsequent to the enactment of La.R.S. 19:14 and that both the St. Julien Doctrine and La.R.S. 19:14 were applicable to the resolution of their dispute. He held that the defendants have acquired a servitude of passage over the road for access to the pumping station and a servitude of use over that portion of the plaintiff's property on which the pumping station is situated under both of the above. Plaintiffs have perfected this appeal seeking reversal of the decision on four grounds.
ASSIGNMENTS OF ERROR
1. The trial court erred in applying the St. Julien Doctrine because of the existence of the verbal agreement.
2. The trial court erred in holding that both the St. Julien Doctrine and La.R.S. 19:14 are applicable to this factual dispute.
3. The trial court erred in holding the St. Julien Doctrine was constitutional.
4. The trial court erred when it failed to give proper consideration to the unconstitutionality of the St. Julien Doctrine.
Before discussing the above assignments of error, it is necessary to briefly examine St. Julien, Lake, and constitutional, statutory and codal development.
The St. Julien Doctrine was established in 1879 in the case of St. Julien v. Morgan L. & T.R. Co., 35 La.Ann. 924 (1883). In St. Julien, the defendant railroad company entered onto plaintiff's land without permission and constructed a railway upon the land without purchasing or expropriating the property. The court there said:
"... the landowner did not invoke the arm of the law at the time when it could have been of service to him, but on the contrary acquiesced in the defendant's taking possession and using his property, encouraged it to prosecute its work by abstaining from any attempt to prevent it and made no complaint in a court of law of the injuries inflicted upon him until the defendant had expended large sums of money in completing its line. Having thus permitted the use and occupancy of his land and the construction of a quasi public work thereof without resistance or even complaint, he cannot afterwards *666 require its demolition, nor prevent its use, nor treat the Company erecting it as his tenant. He is not debarred from an action for damages by reason of the taking of the land and for its value, but having acquiesced in the entry and encouraged it he did not invite it, he cannot afterwards affect to treat it as tortious. Considerations of public policy, not less than the suggestions of natural justice, require that in such case the owner shall not be permitted to reclaim his property free from the servitude he has permitted to be imposed upon it, but shall be restricted to his right of compensation. Goodin v. Cincinnati, 18 Ohio (St.), 169."
Therefore, by jurisprudential rule, a new theory was created allowing the creation of servitudes by estoppel. From 1879 until 1976, a public or quasi public corporation with powers of expropriation could acquire a servitude over the land of another without expropriation if the landowner consented or acquiesced in the construction. The landowner could not later reject the occupant, but was relegated to an action for compensation and damages. The theoretical justification of St. Julien was the combined presumed consent of the owner of the land and the public interest. To avoid the needless waste and public inconvenience involved in removing expensive works, the court established the fiction that the owner had granted voluntarily what an expropriation suit otherwise would have compelled him to yield.
St.Julien was re-affirmed in many later cases and remained the rule of law until 1976 when Lake, Inc. v. Louisiana Power & Light Company, 330 So.2d 914 (La.1976) was decided.
The Lake case abolished the St. Julien Doctrine with respect to discontinuous apparent servitudes, but held its decision applied prospectively only. The majority opinion in Lake classified an electrical transmission line as a discontinuous[2] apparent servitude because it required an act of man for its exercise and as such found that under La.C.C. art. 766[3] it could only be acquired by title. Lake overruled St. Julien and its progeny as to prospective conduct because St. Julien sanctioned a method of creating servitudes contrary to the mandates of the Civil Code.[4] In addition, Lake rejected the policy rationale of St. Julien, finding that although it may have once been justified by public necessity, now it was no longer needed.
Additionally in Lake, Chief Justice Dixon, author of the opinion, stated as follows:
"Plaintiff strongly urges in brief that the application of the `St. Julien' doctrine violates constitutional prohibitions against taking property without due process (U.S. Const., Amendments 5 and 15) and against taking private property for public use without compensation (La. Const.1974, Art. 1, § 4; La. Const.1921, Art. 1, § 2, La. Const.1913; Art. 167; La. Const.1898, Art. 167; La. Const.1899, Art. 156). The argument is persuasive, but we decline to rest our opinion on constitutional *667 grounds when there are other reasons which lead to the same result. In re Interest of Toler, 262 La. 557, 263 So.2d 888 (1972); Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57 (1972)."
Shortly after the decision in Lake, the Louisiana Legislature adopted La.R.S. 19:14 which provides as follows:
"In any case where the state or its political corporation or subdivision has actually, in good faith believing it had authority to do so, taken possession of privately owned immovable property of another, and constructed facilities upon, under or over such property with the consent or acquiescence of the owner of the property, such owner shall be deemed to have waived his right to contest the necessity for the taking and to receive just compensation prior to the taking, but he shall be entitled to bring an action for such compensation, to be determined in accordance with the provisions of Section 9 of this Title, for the taking of his property or interest therein, the just compensation to be determined as of the time of the taking of the property, or right or interest therein, and such action shall proceed as if the state, its political corporation or subdivision had filed a petition for expropriation as provided for in Section 2.1 of this Title.
In the case where any corporation referred to in Section 2 of this Title has actually, in good faith believing it had the authority to do so, taken possession of privately owned immovable property of another and constructed facilities upon, under or over such property with the consent or acquiescence of the owner of the property, it will be presumed that the owner of the property has waived his right to receive just compensation prior to the taking, and he shall be entitled only to bring an action for judicial determination of whether the taking was for a public and necessary purpose and for just compensation to be determined in accordance with Section 9 hereof, as of the time of the taking of the property, or right or interest therein, and such action shall proceed as nearly as may be as if the corporation had filed a petition for expropriation as provided in Section 2.1 of this Title."
Essentially the above act provides that a landowner who consents or acquiesces to construction on his property by an entity with expropriation powers, thereby waives the right to prior compensation. The owner may thereafter bring an action for just compensation with the amount of recovery fixed as of the time of the taking. Additionally, if the occupation is by a private entity with expropriation powers, the landowner may subsequently challenge the necessity and public purpose of the taking. When the State or its subdivisions are the takers, the act precludes any further challenge of public purpose. For either the State, its subdivisions or a quasi public corporation to enjoy the benefits of the act, it must have proceeded "in good faith believing it had the authority."
Therefore, the St. Julien Doctrine, created and perpetuated jurisprudentially until the Lake decision in 1976, now has been essentially reinstated legislatively through La.R.S. 19:14 to the status of positive law.[5]
Having set forth an abbreviated historical development of the St. Julien Doctrine culminating with the enactment of La.R.S. 19:14, it is also necessary to examine and treat the legislative and constitutional history of this area of the law. The Louisiana Constitution of 1921 was adopted years after the St. Julien Doctrine. Article 1, Section 2 of the Louisiana Constitution of 1921 provided as follows:
"No person shall be deprived of life, liberty or property, except by due process of law. Except as otherwise provided in *668 this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."
Article 1, Section 4 of the 1974 Constitution provides even greater protection for private property rights as follows:
"Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction. Personal effects, other than contraband, shall never be taken.
This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes."
In 1977, there was substantial revision of Book II of the Louisiana Civil Code pertaining to predial servitudes. Article 727 of the Revised Civil Code of 1870 was repealed and the distinction between continuous and discontinuous servitudes was abolished. Article 728 of the Revised Civil Code of 1870 which set forth the distinction between apparent and non-apparent servitudes was retained as Article 707 in the 1977 Revision with no change.[6] Article 3504 of the Civil Code of 1870 providing for thirty years acquisitive prescription of continuous apparent servitudes was repealed in its entirety and replaced by Articles 740 and 742 which provide ten and thirty years acquisitive prescription applicable to apparent servitudes.[7]
Lake held only an owner had the right to permanently impose a servitude on his estate (La.Civ.Code art. 729, now art. 708)[8] and that such can only be accomplished by *669 acts by which property can be transferred (La.Civ.Code art. 743, now art. 722).[9]Lake further held that La.Civ.Code art. 766 provided that continuous non-apparent and discontinuous servitudes could only be established by title and not by prescription (La. Civ.Code art. 765 and 3504)[10] and since an electric transmission line was a discontinuous apparent servitude, St. Julien was in direct conflict with codal provisions and was therefore overruled. The court in Lake said that its decision would apply only to conduct occurring after the date of the decision. The St. Julien Doctrine could still be applied in cases where the conduct occurred before the decision in Lake.
Therefore, the 1977 revisions of Book II of the Civil Code have now eliminated designations of servitudes as continuous or discontinuous and only retains the distinction of apparent and non-apparent servitudes. The entire foundation of the Lake case has been legislatively removed. In Lake, the majority opinion was that an electric transmission line was a discontinuous apparent servitude since it needed the act of man to be exercised. Under the 1977 revision, only non-apparent servitudes cannot be acquired by prescription and must be established by title only. Under the express provisions of Art. 740 of the 1977 Revision, apparent servitudes may be established by title, by destination of the owner, or by acquisitive prescription, whether said servitudes were formerly considered discontinuous or not,[11] cutting away the foundation of Lake and its progeny.

ASSIGNMENTS OF ERROR NOS. 1 AND 2
Appellants argue that Mr. Toups and Lakeside Farms never intended to grant the governing authority any permanent rights of access or to construct the pumping station, and therefore, an essential element, namely consent, was absent for application of either St. Julien or La.R.S. 19:14, and that in any event, both St. Julien and La. R.S. 19:14 could not be applied to this factual dispute. Mr. Toups and Lakeside Farms expressly consented to the location of the pumps on a portion of his property and expressly consented to the use of the road to gain access to the pumps through the Vacherie Street gate. This conduct, with express consent of the landowner, commenced in 1975 (prior to the Lake decision bringing it squarely within the St. Julien Doctrine) and continued until the sale of the property on August 23, 1978, wherein the landowner expressly recognized that he had given his consent for access to the pumping station located on the Tom Foret Canal. Further, his testimony is unequivocal *670 that he had previously given his express consent to placement of the pumps partially on his property in the canal. The occupation of the instant property by the public bodies occurred prior to Lake and continued after Lake bringing the matter under the express provisions of La.R.S. 19:14. The conduct complained of occurred prior to Lake, subsequent to Lake, and prior to and subsequent to the adoption of La.R.S. 19:14.
At this point, it is necessary to distinguish between the occupation of the subject property by the pumping station and the use of the road and Vacherie Street gate. The entire foundation of St. Julien and La.R.S. 19:14 is that a public or quasi public body with powers of expropriation could acquire a servitude over the land of another without expropriation if the landowner consented or acquiesced in the construction. Therefore, for St. Julien and/or La.R.S. 19:14 to apply in the instant case, there must be:
(1) A public or quasi public body with powers of expropriation
(2) Landowner's consent or acquiescence
(3) Construction of a facility in the public interest
All of the above requisites are present and apply to the property occupied by the pumps. The combined presence of consent of the landowner, public interest and the public having built expensive works on private property is the very foundation of St. Julien and La.R.S. 19:14. Consent of the type given herein by Mr. Toups and Lakeside Farms is the precise type of consent envisioned by St. Julien and La.R.S. 19:14. It also should be noted that consent of the landowner, rather than precluding the applicability of the St. Julien Doctrine, is an essential part of same. Rogers v. Louisiana Power & Light Co., Inc., 391 So.2d 30 (La. App. 3rd Cir.1980); State, Through Dept. of Highways v. Champagne, 371 So.2d 626 (La. App. 1st Cir.1979).
Appellants strenuously argue that it was error for the trial court to apply the St. Julien Doctrine and La.R.S. 19:14. We find that the present factual situation is one that squarely falls within both the St. Julien Doctrine and La.R.S. 19:14. See Brooks v. New Orleans Public Service, 370 So.2d 686 (La.App. 4th Cir.1979); writ denied, 373 So.2d 512; Trustee Corp. v. Allen, 359 So.2d 715 (La.App. 4th Cir.1978).
Appellants further contend that Mr. Toups and/or Lakeside Farms had only consented to a day by day use of the property and that from the time that they have owned the property, they only acquiesced in the use. Appellant acquired the property with full knowledge that the prior owners had expressly consented to the construction of the pumping station on a portion of his property and had granted access to the pumping station through the Vacherie Street gate, the latter being expressly set forth in their deed.
In Rogers v. Louisiana Power & Light Co., Inc., supra, our brethren of the Third Circuit were presented with an identical argument in a case factually similar to the instant case. In Rogers, supra, it was stated:
(Page 34)
"It is not perfectly clear from plaintiffs' brief whether they argued that even if Mrs. Schuman did acquiesce, it is also necessary that plaintiffs acquiesced after they purchased the property in 1976. If such an argument is being made, we reject it. In the early case of Webster Sand, Gravel & Construction Company v. Vicksburg S&P Railway Company, 129 La. 1096, 57 So. 529 (1912), the court held that the railway company having constructed its track with the consent or acquiescence of the owner at the time of construction, subsequent owners took the property subject to the servitude even if unrecorded. See also Perret v. Louisiana Southern Railway Company, 118 So.2d 510 (Orl.App.1960). Although several cases have discussed the acquiescence on the part of the owner of the land subsequent to the time the facility was constructed, it appears that these discussions are simply to support the findings that there had been no opposition to the construction or maintenance for *671 many years. See for instance Gumbel v. New Orleans Terminal Company, 186 La. 882, 173 So. 518 (1937). We find no case holding that where the owner at the time of construction acquiesces, the acquiescence of the subsequent owner who files the suit is also necessary." See also Trustee Corp. v. Allen, 359 So.2d 715 (La.App. 4th Cir.1978).
As to the servitude of passage over the road on plaintiffs' property lying adjacent to Forty Arpent Canal through the Vacherie Street gate (access to and from the pumping station), two essential elements of St. Julien and La.R.S. 19:14 are present; namely, consent of the landowner, and public interest and need by a public body possessing powers of expropriation. However, one essential element of both St. Julien and La.R.S. 19:14 is absent; namely, the construction of any type of public facility thereon. In the instant case, the public bodies did not expend any monies in construction of the gate or road and apparently only maintained the Vacherie Street gate keeping it locked. There was no evidence that either public body had constructed anything or expended any sums whatsoever at the Vacherie Street gate and access road to the pumps. Therefore, the trial court erred in applying St. Julien and La.R.S. 19:14 to use of the road and gate because of the absence of construction and/or monies spent, it is clear that neither St. Julien nor La.R.S. 19:14 is applicable.

ASSIGNMENTS OF ERROR 3 AND 4
Appellants contend that the trial court erred in holding the St. Julien Doctrine was constitutional and further erred when it failed to give proper consideration to the unconstitutionality of the St. Julien doctrine. We agree that the trial court erred in failing to consider the constitutionality of St. Julien and La.R.S. 19:14 when he expressly held that both were applicable to the instant case.
The United States Constitution, Amendments 5 and 14, prohibits the taking of private property without due process of law. Article 1, Section 4 of the Louisiana Constitution of 1974, supra, provides even stronger protection for private property rights. Also, Article 1, Section 2 of the Louisiana Constitution of 1974 provides as follows:
"No person shall be deprived of life, liberty, or property, except by due process of law."
The key to the constitutionality or unconstitutionality of both St. Julien and La.R.S. 19:14 are the words "consented" and "acquiesced" in the use or possession of private property by the public or quasi public entity. Black's Law Dictionary[12] defines "consent" as follows:
"A concurrence of wills. Voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith. Agreement; the act or result of coming into harmony or accord. Consent is an act of reason, accompanied with deliberation, the mind weighing as in a balance the good or evil on each side. It means voluntary agreement by a person in the possession and exercise of sufficient mental capacity to make an intelligent choice to do something proposed by another. It supposes a physical power to act, a moral power of acting, and a serious, determined, and free use of these powers. Consent is implied in every agreement. It is an act unclouded by fraud, duress, or sometimes even mistake..."
Black's Law Dictionary[13] defines "acquiescence" as follows:
"Conduct recognizing the existence of a transaction, and intended, in some extent at least, to carry the transaction, or permit it to be carried, into effect. It is some act, not deliberately intended to ratify a former transaction known to be voidable, but recognizing the transaction as existing, and intended, in some extent at least, to carry it into effect, and to *672 obtain or claim the benefits resulting from it, and thus differs from `confirmation,' which implies a deliberate act, intended to renew and ratify a transaction known to be voidable. De Boe v. Prentice Packing & Storage Co., 172 Wash. 514, 20 P.2d 1107, 1110. Passive compliance or satisfaction; distinguished from avowed consent on the one hand, and, on the other, from opposition or open discontent. Paul v. Western Distributing Co., 142 Kan. 816, 52 P.2d 379, 387. Acquiescence from which assent may be reasonably inferred. Frank v. Wilson & Co., 24 Del.Ch. 237, 9 A.2d 82, 86. Equivalent to assent inferred from silence with knowledge or from encouragement and presupposes knowledge and assent. Imports tacit consent, concurrence, acceptance or assent. Natural Soda Products Co. v. City of Los Angeles, Cal.App. 132 P.2d 553, 563. A silent appearance of consent. Failure to make any objections. Submission to an act of which one had knowledge.
It is to be distinguished from avowed consent, on the one hand, and from open discontent or opposition, on the other.
It arises where a person who knows that he is entitled to impeach a transaction or enforce a right neglects to do so for such a length of time that, under the circumstances of the case, the other party may fairly infer that he has waived or abandoned his right. A form of equitable estoppel. Schmitt v. Wright, 317 Ill.App. 384, 46 N.E.2d 184, 192.

Acquiescence and laches are cognate but not equivalent terms. The former is a submission to, or resting satisfied with, an existing state of things, while laches implies a neglect to do that which the party ought to do for his own benefit or protection. Hence laches may be evidence of acquiescence. Laches imports a merely passive assent, while acquiescence implies active assent. In re Wilbur's Estate, 334 Pa. 45, 5 A.2d 325, 331. `Acquiescence' relates to inaction during performance of an act while `laches' relates to delay after act is done."
Although Black's includes in its definition of consent, "acquiescence or compliance therewith," this court's opinion of consent is that it is an act of reason, accompanied by deliberation by a reasonable person who has sufficient mental capacity to make an intelligent choice and carries forth in the choice through the power of acting. The better definition of acquiescence is an act not deliberately intended to ratify a former transaction known to be voidable, but recognizing the transaction as existing; and intended, to some extent at least, to carry it into effect and to obtain or claim the benefits resulting therefrom.
Constitutional rights can be waived.[14] Additionally, the instant case, as concerns the land occupied by the pumps, is likened to the situation presented in Vaughn v. Williams, 345 So.2d 1195 (La.App. 3rd Cir. 1977). In Vaughn, La.R.S. 48:491[15] was *673 held to meet constitutional standards primarily because the landowner had knowledge of and acquiesced in the maintenance of a road by a public authority and accepted the benefits of public maintenance for a period of time in excess of three years. The court held that this is "akin" to the public acquiring a servitude by way of prescription under Article VI, Section 24 of the Louisiana Constitution of 1974.[16]
The same rationale applies to the facts of the instant case because the landowner had expressly consented to the placement of the pumps on his property with the consent preceeding the taking and forming the predicate of the taker's action. Good faith of the taker is not at issue because the takers (public entities with powers of expropriation), proceeded with the landowner's express consent. Once a public entity with powers of expropriation has constructed facilities upon, over or under property with the express consent of the landowner, both constitutional due process and payment prior to expropriation are waived by the landowner.[17]
Therefore, for the above and foregoing reasons, the judgment of the trial court declaring that appellants do not have the right to cause appellee to remove their pumping station from plaintiffs' property is hereby affirmed, together with the judgment declaring appellees as owners of a servitude of use over that portion of appellants' property on which the defendants' pumping station is located, reserving unto appellants their rights, if any, to seek compensation for use of the property that the pumping station occupies.[18]
As concerns the judgment decreeing a servitude of passage over the road on plaintiffs' property lying adjacent to the Forty Arpent Canal through the Vacherie Street gate for access to and from said pumping station, said judgment is hereby reversed. It is herein decreed that appellants do not have a servitude of passage through the Vacherie Street gate and/or the access road to the pumping station. However, all proceedings to evict appellees are herein stayed for a period of thirty (30) days from the finality of this judgment to allow appellees an opportunity to institute expropriation proceedings as concerns said access. Upon institution of expropriation proceedings within the above time period, this stay order shall be continued in effect during the diligent prosecution thereof with the right remaining in this court to exercise its supervisory jurisdiction to recall this stay order on proper showing.
*674 For the above and foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part.
AFFIRMED IN PART, REVERSED IN PART.
NOTES
[1] Lake, Inc. v. Louisiana Power & Light Company, 330 So.2d 914 (La. 1976).
[2] Justice Tate, concurring in part and dissenting in part, was of the opinion that a power line right of way is a continuous apparent servitude rather than a discontinuous apparent servitude. 330 So.2d 918.
[3] In the 1977 revision of Book II of the Revised Civil Code of 1870, art. 766 has been repealed and a totally new article substituted in lieu thereof pertaining to resolutory conditions. Article 739 of the 1977 Revision of Book II, amended by 1978, No. 479, § 1 provides as follows:

"Nonapparent servitudes may be acquired by title only, including a declaration of destination under Article 741."
Article 740 of the 1977 Revision of Book II provides as follows:
"Apparent servitudes may be acquired by title, by destination of the owner, or by acquisitive prescription."
[4] La.C.C. art. 766, before the 1977 Revision was as follows:

"Continuous nonapparent servitudes, and discontinuous servitudes, whether apparent or not, can be established only by a title.
Immemorial possession itself is not sufficient to acquire them.
Immemorial possession is that of which no man living has seen the beginning, and the existence of which he has learned from his elders."
[5] Cf. 51 Tul.R. 375; Cf. also 37 La.L.R. 147. Cf. also, 37 La.L.R. 326 wherein Professor Yiannopoulas, referring to La.R.S. 19:14, stated: "The act does not overrule legislatively the Lake decision. Thus, St. Julien is not resurrected; it is merely un-dead, feeding on servitudes established prior to Lake."
[6] Article 728 of the Revised Civil Code of 1870 provided:

"Again, servitudes are either visible and apparent or non-apparent.
Apparent servitudes are such as are to be perceivable by exterior works; such as a door, a window, an aqueduct.
Non-apparent servitudes are such as have no exterior sign of their existence; such, for instance, as the prohibition of building on an estate, or of building above a particular height."
Article 707 of the Revised Civil Code after the 1977 Revision provides:
"Predial servitudes are either apparent or nonapparent. Apparent servitudes are those that are perceivable by exterior signs, works, or constructions; such as a roadway, a window in a common wall, or an aqueduct.
Nonapparent servitudes are those that have no exterior sign of their existence; such as the prohibition of building on an estate or of building above a particular height."
[7] Article 740 of the Revised Civil Code after the 1977 Revision provides:

"Apparent servitudes may be acquired by title, by destination of the owner, or by acquisitive prescription."
Article 742 of the Revised Civil Code after the 1977 Revision provides:
"The laws governing acquisitive prescription of immovable property apply to apparent servitudes. An apparent servitude may be acquired by peaceable and uninterrupted possession of the right for ten years in good faith and by just title; it may also be acquired by uninterrupted possession for thirty years without title or good faith."
[8] Article 729 of the Revised Civil Code of 1870 provided:

"The right of imposing a servitude permanently on an estate belongs to the owner alone."
Article 708 of the Revised Civil Code after the 1977 Revision provides:
"The establishment of a predial servitude by title is an alienation of a part of the property to which the laws governing alienation of immovables apply."
[9] Article 743 of the Revised Civil Code of 1870 provided:

"Servitudes are established by all acts by which property can be transferred, and as they are not susceptible of real delivery, the use which the owner of the estate to whom the servitude is granted, makes of this right, supplies the place of delivery."
Article 722 of the Revised Civil Code after the 1977 revision provides:
"Predial servitudes are established by all acts by which immovables may be transferred. Delivery of the act of transfer or use of the right by the owner of the dominant estate constitutes tradition."
[10] Article 765 of the Revised Civil Code of 1870 provided:

"Continuous and apparent servitudes may be acquired by title, or by a possession of ten years. The public, represented by various parishes in this State, may also in like manner acquire a servitude by the open and public possession and use of a road for the space of ten years, after the said road or servitude has been declared a public highway by the Police Jury, provided that such servitude so acquired shall not extend beyond the width of forty feet."
Article 3504 of the Revised Civil Code of 1870 provided:
"A continuous apparent servitude is acquired by possession and the enjoyment of the right for thirty years uninterruptedly, even without a title or good faith."
[11] Cf. also Article 742 of Revised Civil Code after the 1977 Revision which provides as follows:

"The laws governing acquisitive prescription of immovable property apply to apparent servitudes. An apparent servitude may be acquired by peaceable and uninterrupted possession of the right for ten years in good faith and by just title; it may also be acquired by uninterrupted possession for thirty years without title or good faith."
[12] 5th Edition, Henry Campbell Black, M.A. (West Publishing Company 1979).
[13] Ibid.
[14] Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Shepard v. Barron, 194 U.S. 553, 568, 24 S.Ct. 737, 742, 48 L.Ed. 1115 (1904); Pierce v. Somerset R.Y., 171 U.S. 641, 19 S.Ct. 64, 43 L.Ed. 316 (1898); Ladnier v. Mollere, 230 La. 784, 89 So.2d 301 (1956).
[15] La.R.S. 48:491 as amended by Acts 1954, No. 639, § 1, provided as follows:

"All roads or streets in this state that are opened, laid out or appointed by virtue of any act of the legislature or by virtue of an order of any parish governing authority in any parish, or any municipal governing authority in any municipality, or which have been or are hereafter kept up, maintained or worked for a period of three years by authority of any parish governing authority in its parish or by authority of any municipal governing authority in its municipality shall be public roads or streets as the case may be. Also all roads or streets made on the front of their respective tracts of lands by individuals when the lands have their front on any of the rivers or bayous within this state shall be public roads when located outside of municipalities and shall be public streets when located inside of municipalities.
La.R.S. 48:491 as amended by Acts 1980, No. 517, § 1, now provides as follows:
"A. All roads or streets in this state that are opened, laid out, or appointed by virtue of any act of the legislature or by virtue of any order of any parish governing authority in any parish, or any municipal governing authority in any municipality shall be public roads or streets, as the case may be.
B. All roads or streets in this state which have been or hereafter are kept up, maintained, or worked for a period of three years by authority of a parish governing authority within its parish, or by authority of a municipal governing authority within its municipality, shall be public roads or streets, as the case may be, unless in the parish of Vermillion only such maintenance operations are conducted by authority of a parish or municipal governing authority pursuant to a written contract with the landowner which specifies that a private road or street shall not be or become a public road or street.
C. All roads or streets made on the front of their respective tracts of lands by individuals when the lands have their front on any of the rivers or bayous within this state shall be public roads when located outside of municipalities and shall be public streets when located inside of municipalities."
[16] Article 6, Section 24 of the Louisiana Constitution of 1974 provides:

"The public, represented by local government subdivisions, may acquire servitudes of way by prescription in the manner prescribed by law."
[17] No opinion is expressed herein as concerns those pre-Lake situations pertaining to conduct occurring prior to the date of the Lake decision wherein the landowner has only acquiesced in the placement of the object upon his property. The same is true as concerns those decisions subsequent to La.R.S. 19:14 wherein only acquiescence on the part of the landowner is present as well as to those situations wherein either St. Julien and La.R.S. 19:14 may be applied to private entities with powers of expropriation, especially in light of Article 1, Section 4 of the Louisiana Constitution of 1974, supra.
[18] We are not presented with the issues of whether the claim for compensation has prescribed and/or who is entitled to compensation since the occupancy preceeded St. Julien and also continued after the adoption of La.R.S. 19:14.